## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **LARRY FITZPATRICK,**<br>**Plaintiff,** | )<br>) |
| | ) |
| v. | ) **Civil Action No.: 2:07-CV-528-WHA** |
| | ) |
| **CITY OF MONTGOMERY, ALABAMA,**<br>**Defendant.** | )<br>) **April 23, 2008** |

### PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Larry Fitzpatrick, and pursuant to this Court's

April 3, 2008, Order, hereby presents his Motion in Opposition to Defendant's

Motion for Summary Judgment, filed April 2, 2008, in this cause. As grounds for

and support of Plaintiffs' Opposition, Plaintiff presents the following:

Exh. 1 - Plaintiff's Brief in Opposition to Defendant's Motion for Summary
Judgment

Exh. 2 – Department of Industrial Relations Hearing Transcript (DIR HT),
pp. 6, 13, 21, 24, 35, 40 and 41

Exh. 3 – November 12, 2004 Charge of Discrimination to the Equal
Employment Opportunity Commission

Exh. 4 - January 26, 2005 Negotiated Settlement Agreement

Exh. 5 – June 1, 2005 Notice of Departmental Disciplinary Hearing and
Attachment

Exh. 6 - Plaintiff's Response to Charges Filed By Departmental Head

Exh. 7 - June 6, 2005 Notification of Cancellation of Disciplinary Hearing

Exh. 8 - August 11, 2005 Charge of Discrimination to the Equal Employment
Opportunity Commission

Exh. 9 - January 13, 2006 Recommendation for Disciplinary Action

Exh. 10 – May 23, 2006 City County Personnel Board Hearing Transcript: Gaddis testimony, pp. 25, 28; Crum testimony, pp. 91-96; Shuford testimony pp. 116-119, 125, 144-145; Edwards testimony, pp. 152-153; McLeod testimony, pp. 158-159; White testimony, pp. 164-166; Hardy testimony, pp. 169-174; and Fitzpatrick testimony, pp. 176-180, 191-197

Exh. 11 – Statements of Plaintiff and Witnesses

Exh. 12 - Maintenance Records for Vehicle 6210-2996

Exh. 13 - Affidavit of Gregory Johnson

Exh. 14 - Affidavit of Rodney Hardy

Exh. 15 - Affidavit of Robert Shuford

Exh. 16 – January 19, 2007 Letter of Determination from the Equal Employment Opportunity Commission

The foregoing considered, Plaintiff respectfully requests that this court

deny Defendants' Motion for Summary Judgment.

Respectfully submitted, this the 23rd day of April, 2008.

/s/ Joseph C. Guillot
JOSEPH C. GUILLOT (GUI011)
Attorney for the Plaintiff


OF COUNSEL:
**McPHILLIPS SHINBAUM, L.L.P.**
516 S. Perry Street
P.O. Box 64
Montgomery, AL 36101
(334) 262-1911
(334) 263-2321 fax

## CERTIFICATE OF SERVICE

I hereby certify that this 23rd day of April, 2008, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Wallace Mills, Esq.
City of Montgomery Attorney's Office
103 N. Perry Street, Room 200
Montgomery AL 36104

/s/ Joseph C. Guillot
OF COUNSEL

# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY FITZPATRICK, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2:07-CV-528-WHA |
| | ) | |
| CITY OF MONTGOMERY, ALABAMA, | ) | |
| Defendant. | ) | April 23, 2008 |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Larry Fitzpatrick (hereinafter Plaintiff or Mr. Fitzpatrick), by and through counsel, and presents as his Brief in Opposition to Defendant's Motion for Summary Judgment, the following:

### FACTS OF THE CASE

1.      Mr. Fitzpatrick (African American) was an employee of the City of Montgomery for fifteen (15) years.  (Exh. 2 - Department of Industrial Relations (DIR HT), p. 6, ln. 8-14)  For the last six years of his tenure with the City, he served as an automotive mechanic with the City Garage, maintaining and repairing City vehicles.  (Exh. 2 - DIR HT, p. 24, ln. 7-18)

2.      During his tenure with the City Garage, Mr. Fitzpatrick was subjected to discrimination and retaliation at the hands of his supervisors, primarily Terry Gaddis, Director of the Fleet Management Department, and Royce Albright, Superintendent of the Automotive Equipment Division.  In the first discriminatory incident covered by his Complaint, Mr. Fitzpatrick and a similarly situated Caucasian mechanic, namely Johnny Ray Smith, had a verbal altercation when leaving work on or about October 6, 2004.  As a result of that

altercation, Mr. Fitzpatrick and Mr. Smith each filed complaints against the other with the Montgomery Police Department. Supervisors also brought disciplinary actions against the two men—ordering both to report for drug tests. However, Mr. Fitzpatrick was directed to take anger management classes, while Mr. Smith was not ordered to do so. As a result of this inequitable treatment, Mr. Fitzpatrick filed a charge of discrimination with the EEOC on November 12, 2004. (Exh. 3)

3.    The EEOC conducted mediation between Mr. Fitzpatrick and the City of Montgomery on or about January 26, 2005, and the parties reached a settlement agreement. (Exh. 4) In that agreement, the parties agreed Mr. Fitzpatrick would be treated fairly in the terms and conditions of his employment and that his supervisors would not harass or retaliate against him for filing his complaint. That did not happen, however.

4.    On June 1, 2005, Mr. Fitzpatrick was notified that he was to be disciplined for three issues that had allegedly occurred prior to the settlement agreement. (Exh. 5) The first was for insubordination arising out of the incident with Mr. Smith on October 6, 2004, because Mr. Fitzpatrick would not provide, to his supervisor, a copy of the October 25, 2004 Complaint he filed against Mr. Smith. The second issue involved an allegation that Mr. Fitzpatrick had failed to properly install a hat seal in the fuel tank of a police cruiser when he changed the fuel pump in that vehicle on or about November 8, 2004. The third incident was an allegation that Mr. Fitzpatrick failed to properly tighten the lug bolts on a city maintenance van in December of 2004. At first, Mr. Fitzpatrick was to attend a hearing regarding the charges, but the hearing was cancelled and Mr. Fitzpatrick

2

was ordered to provide a written statement. Once he did so, he heard nothing further about the proposed disciplinary action. (Exh. 6, Exh. 7)  Mr. Fitzpatrick filed another EEOC complaint on August 11, 2005, for this disciplinary action alleging race discrimination and retaliation. (Exh. 8)

5.      Then, on or about January 13, 2006, Mr. Fitzpatrick received yet another notice of recommended disciplinary action.  Attached to the notice was a memorandum advising that the recommended action was due to three maintenance infractions allegedly attributed to him.  (Exh. 9 - Recommendation for Disciplinary Action)  First, he was accused **again** of failing to properly install the hat seal in a gas tank of a police vehicle on which he worked on or about November 8, 2004.  Second, he was accused **again** of failing to secure the lug bolts on one wheel of a City van in December of 2004.  (Note that these first two allegations were the exact same incidents noted above.)   Third, he was accused of failing to properly secure the bolts holding the brake calipers on a police vehicle on or about October 25, 2005. (Exh. 2, DIR HT, p. 13, ln. 5-19)

6.      Mr. Fitzpatrick responded to the Notice of Proposed Removal, and hearings were held by the mayor's office and the Montgomery City/County Personnel Board.  In response to each of the charges and allegations, Mr. Fitzpatrick presented written statements and oral testimony from co-workers and master mechanics that it was highly unlikely **any** of the maintenance infractions could have occurred as alleged.  (Exh. 10 - City/County Personnel Board Hearing Transcript, Crum testimony, pp. 87-111; Shuford testimony pp. 111-150; Edwards testimony, pp. 151-156; McLeod testimony, pp. 156-160;  White

testimony, pp. 160-168; Hardy testimony, pp. 169-174; Fitzpatrick testimony, pp. 174-223; Exh. 11)

7.     As to the hat seal incident, Mr. Fitzpatrick presented substantial evidence that this incident would not have occurred as alleged.  In particular, Mr. Fitzpatrick changed the fuel pump on the vehicle on November 8, 2004.  The vehicle was brought into the City Garage twice, once for an unrelated repair and once for a preventive maintenance inspection, between November 8 and December 20, 2004.  Mr. Fitzpatrick did not work on the vehicle during this timeframe.  The seal was allegedly missing on December 20, 2004.  (Exh. 12 - Maintenance Records, Vehicle 6210-2996)  Several mechanics and master mechanics testified that, for the missing hat seal to go undiscovered in this manner was virtually impossible.

8.     Master Mechanic Robert Shuford (African American) and Mechanic Gregory Johnson (African American) testified that the problem would have been noticed before five to six weeks passed.  Master mechanic Charlie Crum (African American) testified that, if the hat seal was missing, it would have been obvious when the vehicle operator put gas in the vehicle, because gasoline would have leaked onto the ground.  Mechanic Rodney Hardy (African American) also testified that the check engine light would have come on, due to a pressure leak in the fuel tank, if the hat seal was missing.  These mechanics agree that because the vehicle was brought into the Garage twice, mechanics would have detected the missing seal.  (Exh. 13 - Johnson Affidavit; Exh. 10 - PB HT, Crum testimony, pp. 94-96; Exh. 14 - Hardy Affidavit; Exh. 15 - Shuford, p. 3)

9.      As to the December of 2004 lug nut incident, Mr. Fitzpatrick provided substantial evidence that the incident could not have occurred as alleged.  First, he and other mechanics testified that he backed the city maintenance van down a steep incline, drove the vehicle from the wheel alignment rack and around the garage a couple of times before stopping it at the ready line.  (Exh. 10 – PB HT, Shuford testimony, p. 125; Fitzpatrick testimony, pp. 191-193)  When the vehicle was picked up from the ready line by the operator, the left wheel was loose and he stopped to determine what the problem was.  It was found that only one lug nut was still on the front wheel on the driver's side.  Mr. Fitzpatrick and Mechanic Donald White went out to the vehicle and Mr. Fitzpatrick found the missing lug nuts on the ground in the rear of where the vehicle had been parked on the ready line.  (Exh. 10 - PB HT, White testimony, p. 164-165)  Mechanics and master mechanics testified that this situation could not have occurred as it was alleged.

10.      First, the vehicle would not have been able to back off of the rack with only one lug nut loosely attached.  (Exh. 15, Shuford Affidavit, p. 2; Exh. 13, Johnson Affidavit)  Additionally, Mr. Fitzpatrick would have noticed the wobbling front wheel when he test drove the vehicle around the garage.  (Exh. 10 - PB HT, Crum testimony, p. 96)  Further, if the lug nuts had been so loose as to have fallen off, there would have been major damage to the lug studs.  There was no such damage according to Mechanic Donald White.  (Exh. 10 - PB HT, White testimony, p. 166)  Also, it would have been impossible for the lug nuts from the driver's side front wheel to have fallen off and rolled to the area behind where the vehicle was previously parked on the ready line.  (Exh. 13 - Johnson Affidavit, p.

1; Exh. 10 - PB HT, Crum testimony p. 96)  Mr. Fitzpatrick asserts that someone may have tampered with his work.  (Exh. 10 – PB HT, Fitzpatrick testimony, pp. 195-197)

11.    It was interesting to note that at the Department of Industrial Relations Appeals Board Hearing Mr. Terry Gaddis testified that the wheel on the van actually came off.  He stated, **"It came off in the parking lot and it rolled ten, fifteen, twenty feet, something like that."**  (Exh. 2 - DIR HT, p. 21.)  Then shortly thereafter, Mr. Gaddis recanted his testimony by saying, "**I don't think the tire actually came off the vehicle,** it was just wobbling and very, very loose."  (Exh. 2 - DIR HT, p. 35)

12.    In the caliper bolt incident, which led to the employment termination action at issue, Mr. Fitzpatrick asserts that Master Mechanic Robert Shuford road tested the vehicle with him and found no problems.  Mr. Shuford admitted that as a supervisor, he would have road tested the vehicle, but given that he does test drives with mechanics daily, he could not specifically recall road testing that vehicle with Mr. Fitzpatrick on that particular occasion.  Mr. Shuford did say, however, that there was "no way those bolts could have been left out of the caliper when the mechanic and master mechanic drove the vehicle."   The road test would have discovered the missing caliper bolt problem.  (Exh. 10 - PB HT, Shuford testimony, p. 116; Exh. 10 - PB HT Crum testimony, p. 91)

13.    Additionally, it was alleged that the caliper had fallen out of its position and was hanging below the vehicle by the hydraulic line.  This could not happen, according to Master Mechanics Charlie Crum and Robert Shuford.

(Exh. 15 - Shuford Affidavit, p. 2) Charlie Crum stated it was not possible for the caliper to simply fall off and he added that the system is designed such that there is only about one quarter of an inch clearance between the caliper and the wheel. The caliper would have to move approximately three inches to be removed from the bracket and fall from its position. (Exh. 10, PB HT Crum testimony, p. 92; Exh. 10 - Shuford testimony, p. 119)

14.    Mr. Fitzpatrick had raised allegations that someone had tampered with his work during the year leading up to his termination. He had showed other employees instances of suspected tampering. Mechanic Rodney Hardy and Mr. Ronny Edwards testified that Mr. Fitzpatrick had showed him an instance of suspected tampering. (Exh. 10 – PB HT, Hardy testimony, p. 169-170, Edwards testimony, pp. 152-153; Exh. 14 - Hardy Affidavit, p. 2) Mr. Fitzpatrick brought allegations of tampering to his supervisor, Robert Shuford, who reported them to Mr. Terry Gaddis. (Exh. 11; Exh. 10 - PB HT, Shuford testimony, pp. 144-145; Fitzpatrick testimony, pp. 176-177) Mr. Donald White also reported tampering to Mr. Shuford, who reported it to Mr. Albright. (Exh. 10, p. 144-145; Exh. 11) Neither Mr. Albright, nor Mr. Gaddis, took any action regarding these reports of tampering. Mr. Gaddis acknowledged that he had received reports of tampering from Mr. [Rodney] Edwards, Mr. [Rodney] Hardy and Mr. [Donald] White. However, he testified that because he considered the "tampering" to be "petty theft" he did not even discuss these reports with Mr. Edwards, Mr. Hardy or Mr. White. (Exh. 10 - PB HT Gaddis testimony, p. 25, 28)

15.    Nonetheless, in the hearings before the mayor's representative and the City County Personnel Board, Mr. Fitzpatrick's termination was upheld. After Mr. Fitzpatrick's employment was terminated, he applied for Unemployment Compensation benefits and, despite the City's challenge, he was awarded said benefits. The City appealed, but failed to attend the appeals hearing and the DIR hearing officer properly denied the City's appeal. The City appealed the hearing officer's ruling and a hearing was held before the DIR Board of Appeals on or about August 25, 2006, which affirmed the DIR hearing officer's ruling. (Exh. 2 – DIR HT)

16.    During that hearing, the City presented its reasons for terminating Mr. Fitzpatrick's employment. However, one of the City's own witnesses, Mr. Terry Gaddis, who was instrumental in recommending the termination of Mr. Fitzpatrick, admitted that instances where mechanics fail to complete maintenance actions are not termination offenses and that mechanics are given an opportunity to correct deficiencies. (Exh. 2, DIR HT, p. 40, ln. 5-19) Mr. Gaddis also admitted that, after mechanics such as Mr. Fitzpatrick, performed maintenance actions on city vehicles, such as brake repairs, supervisory master mechanics should have checked the repairs. Therefore, the infractions, if they occurred, should have been caught and corrected by supervisors before the vehicles left the City Garage. (Exh. 2, DIR HT, p. 41, ln. 13 - p. 42, ln. 9)

17.    Mechanics at the City Garage testified that Caucasian employees, who have the same or similar maintenance issues as were alleged against Mr. Fitzpatrick, are not disciplined.  Mr. Kenny Smith (Caucasian) failed to replace a

8

plug in the rear axle of a vehicle allowing the oil to drain out, which resulted in a ruined rear axle. He was only given a letter of counseling. (Exh. 15, Shuford Affidavit, p. 2) Mr. Johnny Ray Smith (Caucasian), who allegedly discovered the missing hat seal in the vehicle Mr. Fitzpatrick repaired, and supposedly replaced the hat seal, failed to properly repair it and caused a needless expenditure of approximately $1,300 in parts. Mr. Smith actually crimped the fuel line, which prevented fuel from getting to the engine. (Exh. 10 – PB HT, McLeod testimony, p. 158-159; Exh. 15, Shuford Affidavit, p. 3) Mr. Smith received no discipline for this infraction.

18.    Rodney Hardy (African American) testified that he was accused of leaving a part in the wheel of a vehicle and was suspended for three days. Johnny Ray Smith (Caucasian) was told to fix that wheel, and following his repair work, the vehicle was returned with the wheel so hot, that it had to be cooled with water. Mr. Hardy also testified that Mr. Smith was supposed to have repaired the brakes on a Ford Taurus. When the vehicle was placed on the alignment rack and the wheel drum was removed, the brake parts fell out onto the floor. Yet Mr. Smith received no disciplinary action for either of these maintenance negligence issues. (Exh. 14, Hardy Affidavit, p. 2)

19.    African American employees are subjected to harsher discipline at the City Garage. Mr. Johnny Ray Smith (Caucasian) cursed Garage Foreman Royce Albright but received no discipline. African American employee Gregory Johnson merely asked a work-related question in a meeting and he was

9

suspended for ten days. (Exh. 15, Shuford Affidavit, p. 3; Exh. 13, Johnson Affidavit)

20. The EEOC found that there was cause to believe Mr. Fitzpatrick was a victim of race discrimination and retaliation. (Exh. 16, EEOC Letter of Determination)

## LAW RELEVANT TO THIS CASE

### Summary Judgment Standard

21. A party seeking Summary Judgment always bears the initial responsibility of informing the district court of the basis for [his] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which [he] believes demonstrate the absence of a genuine issue of material fact. The moving party has the burden of demonstrating that no genuine issue as to any material fact exists, and that it is entitled to judgment as a matter of law. *Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986), 91 L.Ed.2d. 265 (1986), citing, Fed. Rules Civ. Proc. Rule 56(c).

22. A fact is material if, under applicable substantive law, it might affect the outcome of the case. [1]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is genuine if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). The Court

---

[1]Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling in a motion for summary judgment or for a directed verdict.

considers the evidence and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970*); Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993).

23.    The Court must reject any effort by a defendant to interpret the facts.  It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather to decide whether issues exist to be tried.  The Court must avoid weighing conflicting evidence or making credibility determinations. *Hairston v. Gainsville Sun Publishing Co.,* 9 F. 3d 913, 919 (11th Cir. 1993); *Anderson v. Liberty Lobby*, 477 U.S. 242, 206 S.Ct. 2505 (1986).

24.    The Eleventh Circuit has said, that a grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable where employment discrimination plaintiff has established *prima facie* case, because of elusive factual question of intentional discrimination. *Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, (11th Cir. 1997)

### Race Discrimination

25.    Mr. Fitzpatrick acknowledges that he has not encountered comments and/or actions at the hands of Defendants that would show direct evidence of discrimination.   Mr. Fitzpatrick's case of discrimination will be proven through circumstantial evidence. According to the 11th Circuit Court of Appeals, in *Schoenfeld v. Babbitt*, 168 F.3d 1257, (11th Cir. 1999), when a Plaintiff attempts to prove intentional discrimination, in violation of Title VII, using

circumstantial evidence, the court applies the shifting burden framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

26.    Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Eskra v. Provident Life and Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir.1997). If the plaintiff meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir.1989). The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094-95. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination. Id. at 255-56, 101 S.Ct. at 1095-96.

27.    According to *Shoenfield*, 168 F.3d at 1269, a plaintiff may show pretext and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir.1997); *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion

of mendacity) may, together with the elements of a *prima facie* case, suffice to show intentional discrimination.")

28.     Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, (2000) citing *St. Mary's Honor Center* v. *Hicks,* 509 U.S. 502, 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. *Reeves*, 530 U.S. 133 citing *Wright* v. *West,* 505 U.S. 277, 296, 120 L. Ed. 2d 225, 112 S. Ct. 2482. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Reeves*, 530 U.S. 133 citing *Furnco Constr. Corp.* v. *Waters,* 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S.Ct. 2943.

29.     Such a showing by the plaintiff will not *always* be adequate to sustain a jury's liability finding. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and introduced sufficient evidence to reject the employer's explanation, no rational fact finder could conclude that discrimination had occurred. The Court need not resolve all such circumstances here. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)

30.    In *Reeves,* the Court said that the employer was not entitled to judgment as a matter of law when, in addition to establishing a *prima facie* case of discrimination and creating a jury issue as to the falsity of the employer's explanation, petitioner introduced additional evidence that the decision maker, was motivated by age-based animus and was principally responsible for the adverse action against the petitioner. Id. at p. 151.

31.    In *Maddow v. Procter & Gamble Co., Inc.*, 107 F.3d 846, 851 (11th Cir. 1997) the court said that at summary judgment, the plaintiffs need only raise a genuine issue of material fact that the reason was a pretext; they do not need to actually prove it.

### Retaliation

32.    According to 42 USC §2000e, no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

33.    In order to establish a *prima facie* case of discrimination for an allegation of reprisal, Plaintiff must show: (1) that he engaged in prior protected activity, e.g., participated in a discrimination proceeding; (2) that the responsible management official was aware of the protected activity; (3) that he was subsequently disadvantaged by an adverse action; and, (4) that there is a causal link between the protected activity and the adverse employment action. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F. Supp. 318 , 324 (D.

Mass), affirmed. 545 F.2d 222 (1st Cir. 1976); see also *Mitchell v. Baldridge,* 759 F.2d 80 , 86 (D.C. Cir. 1985).

34.　　The anti-retaliation provision of discrimination law protects an individual not from all retaliation, but from retaliation that produces an injury or harm. Burlington *Northern and Santa Fe Rwy. v. Smith*, 126 S.Ct. 2405, 2414, 2415 (2006)  The anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.  (*id* at 2413)

## ARGUMENT

35.　　Mr. Fitzpatrick asserts that there are significant issues of material fact that would lead a fact finder to the conclusion that his termination was due to discrimination against him by Defendant's agents, on the basis of race.

36.　　Mr. Fitzpatrick can show a *prima facie* case of race discrimination. He is African American and therefore a member of a protected class.  He was undoubtedly qualified for the mechanic position as he had been a mechanic for over thirty years and had served as a mechanic for the City for six (6) years.  He was treated less favorably than a similarly situated Caucasian mechanic, namely Johnny Ray Smith.  Mr. Fitzpatrick was terminated as a result of alleged maintenance negligence, whereas a Mr. Smith, was not terminated when he committed similar incidents.

37.　　Defendant asserts that Johnny Ray Smith is not similarly situated with Mr. Fitzpatrick, in that Smith never incorrectly installed a part, or failed to install a correct part, that led to a potentially unsafe condition.  (Defendant's SJ

15

Brief, p. 4) This is not factual. Mr. Johnny Ray Smith, who was alleged to have discovered the missing hat seal on a police vehicle, and supposedly repaired that vehicle, actually failed to properly repair it and caused a needless expenditure of approximately $1,300 in parts. (Exh. 15, Shuford Affidavit, p. 3; Exh. 12, p. 4) It was Mr. Fitzpatrick who finally repaired the fuel tank after Mr. Smith's failure to properly do the work.

38.    Additionally, Rodney Hardy testified that Johnny Ray Smith improperly repaired a wheel on that same vehicle that Hardy had previously repaired, and when that vehicle was returned, the wheel so hot that it had to be cooled with water. (Exh. 13, Hardy Affidavit, p. 2) Mr. Smith was not disciplined for this incident.

39.    Mr. Smith has improperly installed brake calipers, as was alleged against Mr. Fitzpatrick. Mr. Smith had performed maintenance on a vehicle and, after it was released to the user, it was returned. When it was placed on a mechanic's rack, and the wheel was removed, the brake caliper merely fell out of its position. (Exh. 13 - Hardy Affidavit) Mr. Smith was not disciplined for this incident, either.

40.    Therefore, Johnny Ray Smith **was** similarly situated with Mr. Fitzpatrick because he was responsible for several incidents of mechanical negligence. Yet, supervisors for the City of Montgomery have not disciplined Mr. Smith for his actions, unlike Mr. Fitzpatrick whose employment was terminated.

41.    Defendant has asserted legitimate reasons for its decision to terminate Mr. Fitzpatrick. The City claims that it terminated Mr. Fitzpatrick for three

incidents of mechanical negligence.   On or about January 13, 2006, Mr. Fitzpatrick received a notice of recommended disciplinary action.  Attached to the notice was a memorandum advising that the recommended action was due to three maintenance infractions allegedly attributed to him.  (Exh. 9 - Recommendation for Disciplinary Action)  First, he was accused of failing to properly install a hat seal in the gas tank of a police vehicle on which he worked on or about November 8, 2004.  Second, he was accused of failing to secure the lug bolts on one wheel of a City van in December of 2004.  And third, he was accused of failing to properly secure the bolts holding the brake calipers on a police vehicle on or about October 25, 2005. (Exh. 2 - DIR Hearing Transcript, p. 13, ln. 5-19)

### Defendant's asserted reasons are a pretext to mask intentional race discrimination.

42.    Defendant's asserted reasons are a pretext, and the real reason Mr. Fitzpatrick was terminated after the alleged maintenance infractions and not Mr. Johnny Ray Smith, was because of Mr. Fitzpatrick's race (African American).

43.    First, Mr. Gaddis testified at the unemployment appeal hearing that usually employees are not terminated for maintenance infractions.  They are given an opportunity to make their own repairs.  (Exh. 2, DIR HT, p. 40, ln. 5-19)  Mr. Fitzpatrick was not allowed to make his own repair, with regard to the incidents involving the hat seal in the fuel tank or the brake caliper.

44.    Second, the first two incidents—involving the lug nuts on the City van and a fuel tank hat seal on a police vehicle—were already resolved in a previous proposal of disciplinary action.  (Exh. 5) Those incidents occurred before a mediated settlement agreement was reached in an earlier complaint to

17

the EEOC. (Exh. 4) The proposed disciplinary hearing was cancelled, but Mr. Fitzpatrick was ordered to submit a written response. Once he submitted his response, he heard nothing further about the disciplinary action. (Exh. 6) As far as Mr. Fitzpatrick knew, that disciplinary action was apparently dismissed.

45.    Third, it was alleged that Mr. Johnny Ray Smith did not fail to install a correct part and did not commit maintenance negligence that would lead to a safety problem for an operator or the general public. (Defendants SJ Brief, p. 4) Clearly Mr. Smith's failure to properly install the brakes on a vehicle would create a safety problem for an operator or the general public. (Exh. 15 - Shuford Affidavit, p. 3; Exh. 14, Hardy Affidavit, p. 2)

46.    Finally, the City knows that the three alleged incidents of maintenance negligence could not have occurred as alleged:

47.    **The alleged missing fuel tank hat seal incident.** (1) A fuel tank without a hat seal would have been detected the first time an operator attempted to use the vehicle—the check engine light would have illuminated. (2) Additionally, the vehicle operator would have discovered the problem when filling the gas tank, because gasoline would have come out of the top of the tank and run onto the ground. (3) Further, five to six weeks elapsed between Mr. Fitzpatrick's repair and the alleged discovery of the missing hat seal, during which time the vehicle was brought in twice, for other maintenance issues—the driver or mechanics would have certainly discovered the problem during that time. (Exh. 15, Shuford Affidavit, p. 3; Exh. 13, Johnson Affidavit; Exh. 10 - PB HT, Crum testimony, pp. 94-96; Exh. 14 - Hardy Affidavit)

48.    **The alleged unsecured lug nuts incident.**  (1) Mr. Fitzpatrick could not have backed the van off of the alignment rack and then driven it around the garage to the ready line with only one lug nut securing the wheel.  (2)  The van would not have been drivable with several lug nuts missing.  (3) The lug studs and lug nuts would have sustained major damage if the lug nuts were loosely fastened as alleged, which they did not.  (4)  Finally, the driver's side front wheel lug nuts would not have been found on the ready line, in the area behind the driver's side rear wheel, where the van was parked before the operator came to retrieve it.  (Exh. 15 - Shuford Affidavit, p. 2; Exh. 13 - Johnson Affidavit; Exh. 10 - PB HT, Crum testimony, p. 96; Exh. 10 – PB HT, Fitzpatrick testimony, pp. 191-193)

49.    **The alleged unsecured brake calipers.**  (1) Mr. Fitzpatrick road tested the vehicle along with Master Mechanic Robert Shuford.  Mr. Fitzpatrick and a master mechanic would have detected a problem with the brake calipers during a road test. (2) Also, the brake calipers could not have fallen out and hung under the vehicle, as was alleged, without removing the wheel.  (Exh. 10 - PB HT, Shuford testimony, p. 116-119; Exh. 10 - PB HT, Crum testimony, pp. 91-92; Fitzpatrick testimony, pp. 178-180)

50.    Therefore, the City's claim that it did not discriminate against Mr. Fitzpatrick due to his race or in retaliation for filing EEOC complaints, but instead terminated his employment due to maintenance negligence, are merely a pretext. A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude

that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000)

51.    As to Mr. Fitzpatrick's retaliation claim, it is undisputed that he filed claims of discrimination and retaliation.  As a result of inequitable disciplinary treatment, Mr. Fitzpatrick filed a complaint with the Equal Employment Opportunity Commission on November 12, 2004.  (Exh. 3)  He filed another EEOC complaint on August 11, 2005, for disciplinary action alleging race discrimination and retaliation following a January 26, 2005 EEOC mediated settlement agreement . (Exh. 8; Exh. 4)  Obviously Mr. Fitzpatrick's supervisors were aware that he had filed EEOC complaints.

52.    Following his August 11, 2005 EEOC complaint, the City of Montgomery issued a Notice of Proposed Removal on January 13, 2006.  In its Notice, the City claimed two incidents (the hat seal and lug nut incidents) that were committed before the EEOC mediated settlement agreement.  Mr. Fitzpatrick believed the disciplinary action for those incidents had been dismissed.  The City also claimed one additional maintenance infraction (the brake caliper incident).  Even though Mr. Fitzpatrick was able to show, through substantial evidence, that these incidents could not have occurred as alleged, the City terminated Mr. Fitzpatrick's employment.  The actions taken against Mr. Fitzpatrick were in retaliation for his filing of complaints of discrimination and retaliation with the EEOC, as noted by the EEOC's Determination Letter.  (Exh. 16, EEOC Letter of Determination)

53.    Mechanics at the City Garage have testified that Mr. Fitzpatrick suffered race discrimination during his employment and that race discrimination still exists at the City Garage. (Exh. 13 – Johnson Affidavit, Exh. 14 – Hardy Affidavit, Exh. 15 – Shuford Affidavit)

Thus, there are material issues of fact as to whether the City terminated Mr. Fitzpatrick due to his race and in retaliation for prior protected disclosures.

## CONCLUSION

Plaintiff  Fitzpatrick has established there are significant issues of material fact that could lead a reasonable fact finder to the conclusion that he suffered race discrimination and retaliation in the City of Montgomery's termination of his employment.  He asserts that Defendant's Motion for Summary Judgment should be denied and his case should move forward to a jury trial.

Respectfully submitted, this the 23rd day of April, 2008.


/s/ Joseph C. Guillot
JOSEPH C. GUILLOT (GUI011)
Attorney for the Plaintiff

OF COUNSEL:
**McPHILLIPS SHINBAUM, L.L.P.**
516 S. Perry Street
P.O. Box 64
Montgomery, AL 36101
(334) 262-1911
(334) 263-2321 fax

21

**CERTIFICATE OF SERVICE**

I hereby certify that this 23rd of April, 2008, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Wallace Mills, Esq.
City of Montgomery Attorney's Office
103 N. Perry Street, Room 200
Montgomery AL 36104

/s/ Joseph C. Guillot
OF COUNSEL

# EXHIBIT

# 2

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

1          STATE OF ALABAMA

2          BOARD OF APPEALS

3

4     DEPARTMENT OF INDUSTRIAL RELATIONS

5          MONTGOMERY, ALABAMA

6                                    COPY

7     IN RE:  Larry Fitzpatrick

8          City of Montgomery

9

10       *    *    *    *    *    *    *    *

11

12          TESTIMONY AND PROCEEDINGS, taken

13     before The State of Alabama Board of

14     Appeals, at the Alabama Department of

15     Industrial Relations, 1060 East South

16     Boulevard, Montgomery, Alabama, on

17     Friday, August 25, 2006, commencing at

18     approximately 10:00 a.m.; and reported

19     by Bridgette Mitchell, Court Reporter

20     and Commissioner for the State of

21     Alababama at Large.

22

23       *    *    *    *    *    *    *    *

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 6

1    with work after previous warning

2    pursuant to Section 25-4-78(3)(b).  We

3    will address questions to both parties

4    beginning with the employer.

5        Who would have the beginning and

6    ending dates of employee's tenure,

7    please?

8            MR. GADDIS:  I will, sir.  The

9    employment date is 9 November of 1990.

10           MR. SCREWS:  Say it one more

11   time, sir.

12           MR. GADDIS:  9 November 1990.

13   And the final termination date was

14   February 8, 2006.

15           MR. SCREWS:  What type of job

16   did the claimant perform, please?

17           MR. GADDIS:  Mr. Fitzpatrick

18   was an automotive mechanic in the

19   fleet management automotive shop,

20   repair shop.

21           MR. SCREWS:  Would you please

22   describe the circumstances which

23   immediately preceded the claimant's

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 13

1    that before y'all made up your mind to

2    terminate him for that incident?

3         MR. GADDIS:  Excuse me just a

4    minute.  If you don't mind, let me

5    refer to this here.  The first

6    incident occurred -- and there was one

7    other incident, I'm sorry, that I did

8    not -- I could not recall 'til I saw

9    this.  There was one other incident

10   that occurred on November 8 of 2004

11   where Mr. Fitzpatrick failed to

12   install a hat-shaped seal on a fuel

13   tank of another police vehicle.  Then

14   in December of 2004, he failed to

15   tighten the wheel lug nuts when

16   replacing the wheel on the van.  And

17   then finally on October 25, he failed

18   to install the rear brake caliper

19   bolts on the police vehicle.  So there

20   were actually three incidents.

21        MR. SCREWS:  So you waited

22   until April -- I'm sorry.  You waited

23   until February 6, 2006, after he had

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 21

1              MR. JONES:  Thank you, sir.

2    Did you say that the wheel came off in

3    the parking lot?

4              MR. GADDIS:  It rolled -- I

5    wasn't there to physically see it, but

6    testimony --

7              MR. JONES:  Well, did you

8    investigate it?

9              MR. GADDIS:  Yes, I had --

10             MR. JONES:  All right.  Well,

11   when did the wheel come off?

12             MR. GADDIS:  It came off in

13   the parking lot and it rolled, I'm

14   going to say, ten, fifteen, twenty

15   feet, something like that.  It did not

16   get out of the public working --

17             MR. JONES:  Mr. Fitzpatrick

18   was the one that was supposed to

19   tighten the lugs and --

20             MR. GADDIS:  Yes, sir.

21             MR. JONES:  -- he evidently

22   didn't tighten them and the wheel came

23   off; is that right?

Page 24

1    case here that you ought to remember

2    because it's been through all kind of

3    appeals and --

4            MR. GADDIS:  Sir, I have

5    several cases I work.  I have it right

6    here.

7            MR. JONES:  All right.  Became

8    an automobile mechanic when,

9    approximately?

10           MR. GADDIS:  That's what I'm

11   fixing to tell you.

12           MR. JONES:  All right.

13           MR. GADDIS:  November 18 of

14   '98.

15           MR. JONES:  So he had been an

16   automobile mechanic for six years?

17           MR. GADDIS:  I'm sorry.

18   November 27 of '98.

19           MR. JONES:  Okay.  Well, 27th.

20   How did he get to be -- become an

21   automobile mechanic?  What kind of

22   promotion system does the city have?

23   Do you bid on jobs?  Are they posted?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 35

1   re -- I corrected myself.  I did not

2   see the vehicle and I do not know -- I

3   know it came loose.  And I'm trying to

4   recall testimony.  I don't think the

5   tire actually came off the vehicle, it

6   was just wobbling and very, very

7   loose.  But the vehicle rolled several

8   feet.

9         MR. GRANGER:  You testified

10   that there had been disciplinary

11   problems from earlier.

12         MR. GADDIS:  Yes, sir.

13         MR. GRANGER:  Was he -- was he

14   reprimanded?  Was he given some kind

15   of write-up?

16         MR. GADDIS:  Yes, sir.  I have

17   a complete list.

18         MR. GRANGER:  Did he receive

19   copies of --

20         MR. GADDIS:  Yes, sir.

21         MR. GRANGER:  What about these

22   three mechanical, I believe those --

23   are any of them mechanical prior to

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 40

1    order, but the work order does not

2    indicate.  That's just a standard

3    procedure that we've had for years.

4    The master mechanics --

5        MR. SCREWS:  And I think you

6    also testified that if the vehicle

7    comes back with a deficiency after

8    being inspected, they just repair it,

9    it's not necessarily a dischargeable

10    action; is that correct?

11        MR. GADDIS:  It's not

12    considered complete.  But if there's a

13    problem -- no, sir.  There's many

14    times when they work on a vehicle and

15    you go check it and it maybe -- that

16    wasn't the problem, something else

17    caused that or so forth.  So if it's

18    not completed, it's pulled back in the

19    shop.

20        MR. SCREWS:  I guess without

21    any logs and without any kind of

22    procedure that requires these

23    inspectors to inspect these jobs, some

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 41

1  go and some don't go, is that correct,

2  get inspected?

3         MR. GADDIS:  Depending on what

4  the job is.  If it's a simple job,

5  change the oil filter, things like

6  that, there's no need to inspect.

7         MR. SCREWS:  But with brakes

8  you always have --

9         MR. GADDIS:  Safety items,

10 something that could cause someone to

11 get hurt.  Or if a motor has been

12 changed out, something --

13        MR. SCREWS:  How would a car

14 get out of your garage on a safety

15 violation without doing inspection, is

16 my question?

17        MR. GADDIS:  It shouldn't

18 have, sir.

19        MR. SCREWS:  We don't know if

20 it did or not, though; is that

21 correct?

22        MR. GADDIS:  I assumed -- and

23 I assumed that my master mechanic, who

1           *   *   *   *   *   *   *   *   *   *   *

2                   REPORTER'S   CERTIFICATE

3           *   *   *   *   *   *   *   *   *   *   *

4      STATE OF ALABAMA

5      COUNTY OF MONTGOMERY

6              I hereby certify that the above and

7      foregoing proceeding was taken down by me by

8      stenographic means, and that the content

9      herein was produced in transcript form by

10     computer aid under my supervision, and that

11     the foregoing represents, to the best of my

12     ability, a true and correct transcript of

13     the proceedings occurring on said date at

14     said time.

15             I further certify that I am neither

16     of counsel nor of kin to the parties to the

17     action; nor am I in anywise interested in

18     the result of said case.

19

20

21

22     _Bridgette Mitchell_
       Bridgette Mitchell
23     Reporter and Notary Public
       State of Alabama at Large

# EXHIBIT

# 3

| CHARGE OF DISCRIMINATION | | AGENCY | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form | | ☐ FEPA<br>X EEOC | 130-2005-00649 |
| | | and EEOC | |

| | | | State or local Agency, if any | | |
|---|---|---|---|---|---|

| NAME (Indicate Mr. Ms., Mrs.) MR. LARRY FITZPATRICK | HOME TELEPHONE (Include Area Code) 334-612-02E |
|---|---|
| STREET ADDRESS 5137 Newbury Lane | CITY, STATE AND ZIP CODE Montgomery, AL 36106 | DOB 7-25-53 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME City of Montgomery | NUMBER OF EMPLOYEES, MEMBERS 500 plus | TELEPHONE (Include Are Code) (334) 241-2050 |
|---|---|---|
| STREET ADDRESS 103 North Perry Street, Montgomery, Alabama 36104; Post Office Box 1111, Montgomery, Alabama 36101-1111 | | COUNTY Montgomery |

| NAME | PHONE NUMBER (Include Area Code) |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| | EARLIEST (ADEA/EPA)          LATEST (ALL) |
| X RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ AGE | within the last 180 days |
| X RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On or about October 29, 2004, my supervisor and department head Terry Gaddis ordered me to attend anger management classes. This was ordered after I refused to sign a statement at work with which I had honest disagreement. I do not know of any white employees who have been ordered to attend anger management classes.

I have in the past filed a Charge of Discrimination with the EEOC against my employer. I believe my employer's harassing conduct is in retaliation for my past filing of a Charge of Discrimination. I believe the retaliation and continued racial discrimination are in violation of Title VII of the Civil Rights Act.

NOV 16

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) |
| X 11/12/2004<br>Date          Charging Party (Signature) | |

EEOC FORM 5 (10/94)

# EXHIBIT

# 4

## NEGOTIATED SETTLEMENT AGREEMENT

1.  The following Agreement refers to charge number 130 2005 00649 on file with the Equal Employment Opportunity Commission (EEOC) under Title VII of the Civil Rights Act of 1964, as amended.

2.  In exchange for the satisfactory fulfillment by City of Montgomery of the promises contained in paragraph (3) of this Agreement, Larry Fitzpatrick agrees not to institute a lawsuit with respect to the above referenced charge and further:

3.  In exchange for the promises of Larry Fitzpatrick contained in paragraph (2) of this Agreement, City of Montgomery agrees:

    A.  to evaluate Larry Fitzpatrick based on job performance alone and not let this evaluation be influenced in any way by the filing and resolution of the above referenced charge.

    B.  to provide Larry Fitzpatrick the same terms and conditions of employment as provided to all other employees, such as, transfers, job bidding, promotions, pay raises, working schedules, etc., provided Charging Party follows and meets all prerequisites imposed on all other employees.

    C.  to prohibit any form of harassment or retaliation from any employee or manager of City of Montgomery directed against Larry Fitzpatrick for the filing of the charge of discrimination which resulted in this Agreement.

4.  It is understood that this Agreement does not constitute an admission by the Respondent of any violation of Title VII. Further, the parties agree to hold the terms of this agreement in strict confidence.

5.  The Respondent agrees to provide written notice to the Director of the Birmingham District Office within 10 days of satisfying each obligation specified at paragraph (3) of this Agreement.

6.  It is mutually agreed that this Agreement shall become effective as of the date of the Commission's approval and shall remain in effect for two years from said date.

7.  These parties agree that this Agreement may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this Agreement.

130 2005 00649
**Larry Fitzpatrick v. City of Montgomery**

I have read the foregoing Negotiated Settlement Agreement and I accept and agree to the provisions contained therein:

_____          1/26/05 Date
City of Montgomery
Respondent

_____          1/26/05 Date
Larry Fitzpatrick
Charging Party

I recommend approval of this Negotiated Agreement:

_____          01-26-05 Date
Leon P. Jones
Investigator

I concur in the above recommendation for approval of this Negotiated Settlement Agreement:

_____          01-26-05 Date
Leon Kennedy, Jr.
Investigative Supervisor

The following paragraph is deemed incorporated as part of this Agreement if and when signed by EEOC Office Director.

8.  In reliance on the promises made in paragraphs (2), (3), (5), 6 and (7), the Equal Employment Opportunity Commission agrees to terminate the investigation which it has begun with respect to the above referenced charge and not to use it as the jurisdictional basis for a civil action under Title VII of the Civil Rights Act of 1964. The Equal Employment Opportunity Commission does not waive or in any manner limit its right to process or seek relief in any other charge or investigation including, but not limited to, a charge filed by a member of the Commission against the Respondent.

On behalf of the Commission:

1/28/05
Date                              _____
                                  Bernice Williams-Kimbrough
                                  District Director
                                  Birmingham District Office

-2-

# EXHIBIT

# 5

PER FORM 31
Revised 01/05

## NOTICE OF DEPARTMENTAL DISCIPLINARY HEARING

Larry Fitzpatrick
_____
Employee's Name

5137 Newbury Lane
_____
Street Address

Montgomery, AL  36108
_____
City, State and Zip

Please be advised that a departmental hearing has been scheduled:

June 6, 2005 @ 9:00 a.m.                          Director's Office
_____          _____
Month, Day, Year, Time (to include a.m. or p.m.)          Location of disciplinary hearing

The purpose of a departmental hearing is to consider disciplinary action against you for the following reasons: (attach additional sheets as required).
See Attachment.

You may be present if you desire and you may respond orally and/or in writing at the time of the hearing.  You may not be represented by attorney at department level.  The appointing authority may designate the department head or some other representative to act on his or her behalf in taking disciplinary actions.  You will be advised in writing if you are entitled to a hearing before the appointing authority or his or her designee, before any disciplinary action becomes final, and you will be given the opportunity to waive your appearance at that hearing.

_____
Departmental Head

I hereby certify that this document was given to the employee ~~or placed in the United States mail~~ on

June 1, 2005
_____
(Month        Day        Year)

Signed: _____

Witness: _____

I hereby acknowledge receipt of this notification of said charges and of the hearing thereon.

_____
Employee_ _Employee refused to sign_ _JWT_

_Larry Fitzpatrick_
EMPLOYEE
_I DO NOT AGREE WITH THE ABOVE CHARGES_

ATTACHMENT TO NOTIFICATION OF DEPARTMENTAL HEARING FOR
LARRY FITZPATRICK

CHARGES:

On or about October 25, 2004 you were insubordinate to your division superintendent,
Mr. Royce Albright, by stating to him that his questioning you about an incident (verbal
altercation) that occurred between yourself and Mr. Johnny Smith in the Public Works
employee parking lot after work on or about October 6, 2004, was "NONE OF HIS
BUSINESS." Mr. Albright was attempting to conduct an investigation into the facts
surrounding what had occurred and your failure or refusal to truthfully answer his
questions clearly demonstrate your continued arrogant and insubordinate behavior toward
your supervisor.

Second, on or about November 8, 2004 you failed to install a critical hat shaped seal on
the fuel tank when you replaced the fuel pump on vehicle 6210-2986 causing fuel to
splash out of the tank very close to the vehicle's exhaust system and onto the ground near
the rear wheel when the vehicle was operated. Your inattention to detail and failure to
properly perform this task could have resulted in a catastrophic fire or explosion causing
damage to City property and or personnel injury or death.

On or about the second week of December 2004 you were performing routine
preventative maintenance on vehicle 5800-2484 and you did not tighten the wheel lug
nuts when replacing a wheel causing the wheel to become loose when the vehicle was
operated on the City lot. The loose wheel was discovered and repaired by other
mechanics before the vehicle was operated on the street. Your inattention to detail and
failure to ensure the wheel was properly installed could have resulted in major damage to
City property and or serious personnel injury.

# MEMORANDUM

For:   Mr. Terry H. Gaddis, Director
Fleet Management Department

From:  Mr. Royce W. Albright, Division Superintendent *RwA*
Fleet Management Department

Date:  February 10, 2005

Subj:  Disciplinary Action


1. The attached information details three incidents involving Mr. Larry Fitzpatrick who is employed in my division. Two of these were serious violations of good maintenance practices which could have resulted in serious personnel injury or death. The third incident involved insubordination toward his division superintendent. I request that you review the information and initiate disciplinary action as you deem necessary.

2. The first incident in this package involves Mr. Fitzpatrick leaving out a hat shaped seal approximately 5 inches in diameter by ¼ inch thick when repairing the fuel system on a Chevrolet Blazer vehicle. This caused a huge fuel leak as the vehicle was operated. This fuel leak, which was very near the vehicle's exhaust, could have easily created catastrophic results.

3. The second incident, while less dramatic than the first, involved a wheel which was left loose after preventive maintenance. The driver discovered the loose wheel before the vehicle was operated on the street and other mechanics repaired the problem. If it had not been discovered, Mr. Fitzpatrick could have created an accident due to his negligence.

4. The third incident, which is well documented, involves Mr. Fitzptrick's refusal to answer questions concerning an incident involving himself and another shop employee. The documentation and witnesses prove Mr. Fitzpatrick was clearly insubordinate to his division superintendent.

3 Attachments

# EXHIBIT

# 6

# Response To Charges Filed By Departmental Head

Date: June 6, 2005
Employee: Larry G. Fitzpatrick
Employee No.: 341
Position: Auto Mechanic, Light Division

### I. In answer to the charge of, "...insubordination to division superintendent":

This charge stems from an incident involving myself and Mr. Johnny Smith. On the afternoon of October 6, 2004, at approximately 14:58, I exited the City Lot onto Ripley Street, and headed south...my customary route home. After traveling 75 to 100 yards, I encountered Mr. Smith, who had pulled over into the right lane, coming to a crawl in his vehicle, and was apparently waiting for me. As I passed him, he speeded up, and pulled alongside me. He then yelled out at me in an angry voice, "Larry, you got something you want to say to me? We're not on the City clock now. I'll kick your ass." I responded by saying, "Mr. Smith, the best thing you can do is leave me the hell alone, and if you don't I'll put something on your ass your Daddy never put on it before." But, Mr. Smith continued to ride alongside me, demanding that we settle this argument right then and there. I ignored him and continued on my journey home.

The following morning, October 7, 2004, Superintendent Royce Albright summoned me to his office. We were joined by Mr. Roy Wilson, Master Mechanic Supervisor. Mr. Albright informed me of his concern about an incident that he said had occurred yesterday on City property. I then informed him it did not happen on City property. Mr. Albright replied, "I have an employee, Mr. Johnny Smith, who says otherwise." He also informed me that Mr. Smith had filed a complaint against me with the City of Montgomery Police Department, accusing me of having threatened him.

Mr. Albright then ordered both me and Mr. Smith to take drug tests. I went to City Hall shortly before lunch time and took the test; Mr. Smith supposedly took his test about an hour later.

After lunch that same day, Mr. Albright asked me if I had also filed a complaint with City Police. I replied that what I do on my private time is my business and none of his business. Mr. Albright angrily demanded, "YOU WILL PROVIDE ME WITH A COPY OF THAT STATEMENT!"

### II. In answer to the charge, "...failed to install a critical hat-shaped seal on the fuel tank...on or about November 8, 2004."

At the time I began the original work on the vehicle---October 8, 2004---I determined that the **Hat Seal, or, O-Ring** already installed in the gas tank was, in fact, in good shape, and **DID NOT REQUIRE REPLACEMENT.** I, therefore, left it in place, and **NEVER REMOVED** the original. I did exactly what was required by the worker order, which was to install a new fuel pump on said vehicle. The issue of a "missing hat-shaped seal" did not occur on my watch. When and how it came up missing is also a mystery to me. Also, why wasn't the vehicle returned to ME for repair, as is the general

1

policy in the shop where "come-backs" are concerned? Why was it delivered into the hands of a person who is a well known adversary?

III. In answer to the charge, "...**did not tighten the wheel lug nuts...on or about the second week of December, 2004.**"

As near as I can recall, this was a standard PM (Preventive Maintenance) work order, which, among other things, calls for tire/wheel rotation. During my 35 years as a mechanic, and my 14 years as an employee of the City Garage, it has become my standard operating routine to check the tightness of wheel lug nuts at least three times. First, I snug each individual lug nut on each wheel one at a time with my impact wrench in the standard sequence. Then, I do the actual final tightening of each lug. I then do a final check for tightness, before moving on to the next wheel.

On the vehicle in question, I next drove it around the lot for several minutes to make sure the wheels were tight and that the brakes were functioning correctly. After this test drive, I delivered the vehicle to the Ready Line.

Signed,

*Larry B. Fitzpatrick*          Date *6/16/05*

Larry G. Fitzpatrick

2

*This is a MEMO given to me by Mr. Albright from Mr. Shufford after I instructed Mr. Albright to investigate the incident of the wheel coming loose on the vehicle Mr. Fitzpatrick worked on.*

# Memo

**To:**   Mr. Royce Albright

**From:**  Mr. Robert L. Shuford

**Date:**  February 10, 2005

**Re:**    Leaking fuel incident

---

Mr. Larry Fitzpatrick replaced a fuel pump in vehicle 6210 – 2986 on November 8, 2004, because the vehicle would not start. The vehicle left the Auto Light Division running fine. However, the vehicle returned to the Auto Light Division on December 15, 2004, with a fuel leak at the left rear wheel.

Mr. Johnny Smith's statement about the incident is as follows: "The blazer came in with a bad gas smell. I checked out the gas tank and found a leak. I removed the tank and found the sending unit loose in the tank. I removed the plastic nut and found the O-Ring missing."

Mr. Donald Knight's statement about the incident is as follows: "Johnny Smith called me to look at the tank and asked if there was supposed to be an O-Ring in the top of the tank. I said yes. I told him to look inside the tank to see if the O-Ring had fallen in the tank. There was no O-Ring on the outside or inside of the tank. The O-Ring was missing."

Mr. Robert L. Shuford's statement about the incident is as follows." I observed Mr. Smith removing the gas tank from the vehicle, and Mr. Albright was present when he placed the tank on the ground. However, no one informed me that the O-Ring or (hat gasket) was missing when the tank was first removed. I was sitting in front of the Auto Light Division for about 30 minutes until I went to lunch at 12:00 noon.

After I returned from lunch, Mr. Smith called me over to his work area to show me that the O-Ring or hat gasket (hat gasket is about 4-6 inches in diameter) for the fuel sending unit was missing.

These statements were taken at the request of Mr. Royce Albright.

1

Prepared: 12/15/04  6:30:48    Job Order Number 355281
rogram: FM301L
ITY SHOPS DEPARTMENT                Job number:       j

quip./Reference . . . : 2986 / 6210-2986  2002 CHV CHV CHV BLAZER
 2002 CHEVROLET CHV BLAZER 4 DR UTILITY BLAZER
noine size . . . . . :      6.3 L ?
epartment . . . . . . : 062-010 POLICE DEPARTMENT
IN . . . . . . . . . : 1GNCS13W42K150544                    Job order status:
umber of jobs . . . . :   1                              * O P E N *
riority . . . . . . . :   1                    Opened by : ROYCE W ALBRIGH
quipment warranty . . : 12/07/04   36000  Date/Time scheduled : 0/00/00
 Engine . . . . . . . : 12/07/04   36000  Date/Time removed . . 12/15/04   6:30
 Transmission . . . . : 12/07/04   36000    Returned . . . . . . :
urrent meter . . . . :   62500           Est. Service Time . . :
icense tag number . . : 37950            Meter reading . . . . :          MT
ront tire:  P235/70R15                   Rear tire:  P235/70R15

ob status: * O P E N *        J O B    I N F O
     Work Close/Reason for UK                          Time waiting  Assigned
ob #   System/Problem Desc              Sys/Act         Parts  Labor  employee
─────────────────────────────────────────────────────────────────────────────
  1   NON-SCHEDULED  / DRIVER COMPLAINT                                      0
      3700 FUEL LEAK AT WHEEL WELL AND CHECK ENGINE LIGHT IS
      ON

                                    L A B O R
ob #     Date    Start    End   OT Hrs  Action taken                  Employee
─────────────────────────────────────────────────────────────────────────────
        12/20   6:35   9:00        40                                    360

        12/20   12:00   2:00       40                                    360

```
program: FM115?                    Job Order Summary                        Page    1
ITY SHOPS DEPARTMENT
                         Job order number:   953153
                            Job number:        1

    Opened by:  ROYCE W ALBRIGHT
    Date/time:  11/02/04   6:08
    Equipment:  2986                                    Job order status:
    Reference:  6210-2986                              CLOSED JOB ORDER
  Description:  4 DR UTILITY BLAZER          Date/time/Opened:  11/02/04   6:08
   Department:  062-010 POLICE DEPARTMENT  Removed from Service:  11/02/04   6:08
                                               Repair Scheduled:   0/00/00
ter reading:      60857  MILE            Est. Return to Service:   0/00/00
    Location:  AUTO/LIGHT TRUCK          Act. Return to Service:   0/00/00
  Work class:    3   NON-SCHEDULED      Out of Service Time (hrs.):        176.00
sen for work:   04   DRIVER COMPLAINT
    Priority:   1
/s. reported:  3200   CRANKING SYSTEM & BATTERY
  Sys. actual:  3737   PUMP
ction taken:     20   REMOVED & REPLACED
               REPAIR TO START
```

```
abor:   *=Indirect

                      Act  ---Time---  ----Regular----  ----Overtime----
  Date   Employee     tak on    off   Hours   Rate    Hours   Rate     Total
                                                                        cost

1/08/04 LARRY G FITZPATRI20  6:30 10:45   4.25  35.00    .00   52.50   148.75
1/09/04 LARRY G FITZPATRI20 11:50 13:30   1.67  35.00    .00   52.50    58.45
                Total labor:              5.92          .00           207.20
```

```
arts:
  Date   Loc  Part number      Quantity       Extended              Total
                                                 cost      Markup     cost

1/15/04  N    AAA 12             1.00         930.2300              930.23
              25176789 FUEL PUMP ASSM, INV124839        .00
1/15/04  N    AAA 12             1.00          13.4200               13.42
              3579 FUEL FILTER-INV057529               .00

                                        Total parts:              943.75


                                        Total charge:             550.95
```

*No Gasket installed in tank —*
*Reworked By J.R. Smith on 1/20/04*

(A)

Memo
January 24, 2005

**To:** Royce Albright (A)

From: Mr. Robert L. Shuford

Ref.: Loose Wheel Incident

I do not recall the date that the wheel was loose, but Mr. Larry Fitzpatrick worked on the vehicle and he said he tightened the wheel before backing off the alignment rack. He drove the vehicle around the building several times before parking the vehicle on the ready line.

However, the operator came and picked the vehicle up and drove about 50 feet and notice the wheel was loose. He came into the shop and reported the wheel was loose, and I instructed Mr. Fitzpatrick to go and tighten the loose wheel. Mr. Donald White stated he helped Mr. Fitzpatrick tightened the loose wheel and Mr. Fitzpatrick found the lugs in the area where the vehicle were parked. Mr. Donald Knight stated he heard that Mr. Fitzpatrick left a wheel loose and show him with a jack going to tighten the wheel. However, Mr. White stated that a jack was not used to tighten the wheel. Also, Mr. Knight heard a comment that someone loosening the wheel. Mr. Johnny Smith stated he was in the bathroom and heard Mr. Fitzpatrick say, if the wheel was loose some M. F. was playing with him and he did not play.

Mr. Knox came and asked me about the incident and I told him and that was the extent of the incident.

Signed: Robert L. Shuford

DEC.19'2005

TO: MR. TERRY GADDIS

FROM: RODNEY HARDY

SUBJUCT: STATEMENT FOR MR. FITZPATRICK

I MY SELF HAS WITNESS A COUPLE OF CARS
THAT HE HAS SHOWN ME BEFORE LUNCH AND
AFTER LUNCH WERE TAMPERED WITH SUCH AS
BRAKE LINES WERE LOOSE AND FLUID DRIPPING
TO THE FLOOR.

12/19/05

*Rodney Hardy* (signature)

*Nilla L. Darby* (signature)
NOTARY

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 15, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

# EXHIBIT

# 7

To:      Larry Fitzpatrick, Employee # 341

From:    Terry H. Gaddis, Director
         Fleet Management Department

Date:    June 6, 2005

Subject: Notification for Cancellation of Disciplinary Hearing


This is official notification that I am canceling the disciplinary hearing scheduled for June 6, 2005. However, based on the City's potential liability, I am directing that you respond back to me in writing no later than June 16, 2005, as to these charges and why you disagree with them as stated below your signature on the Personnel Form 31, Notice of Departmental Disciplinary Hearing. This information will be made part of your personnel file.


Your signature below signifies that you understand the above information.



_____              _____
                                           Date



_____
Witness

# EXHIBIT

# 8

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form | ☐ FEPA<br>X EEOC | |

_____ and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) MR. LARRY FITZPATRICK | HOME TELEPHONE (include Area Code) | |
|---|---|---|
| STREET ADDRESS<br>5137 Newbury Lane | CITY, STATE AND ZIP CODE<br>Montgomery, AL 36108 | DOB |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>City of Montgomery | NUMBER OF EMPLOYEES, MEMBERS<br>500 plus | TELEPHONE (Include Are Code)<br>(334) 241-2050 |
|---|---|---|
| STREET ADDRESS<br>103 North Perry Street, Montgomery, Alabama 36104; Post Office Box 1111, Montgomery, Alabama 36101-1111 | CITY, STATE AND ZIP CODE | COUNTY<br>Montgomery |
| NAME | | PHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| | EARLIEST (ADEA/EPA)          LATEST (ALL) |
| X RACE   ☐ COLOR ☐ SEX ☐ RELIGION   ☐ AGE | within the last 180 days |
| X RETALIATION ☐ NATIONAL ORIGIN   ☐ DISABILITY ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I have in the past filed a Charge of Discrimination with the EEOC against my employer (charge number 130 2005 00649). That Charge of Discrimination resulted in a Negotiated Settlement Agreement being reached with the help of EEOC investigators Leon P. Jones and Leon Kennedy, Jr. Since entering into the settlement agreement, I continue to be discriminated against and harassed by my employer. I believe my employer's discriminating and harassing conduct is in retaliation for my past filing of a Charge of Discrimination and past interaction and activities with the EEOC including the negotiation of the settlement agreement mentioned earlier. I believe the retaliation and continued racial discrimination are in violation of Title VII of the Civil Rights Act.

Additionally and specifically, on or about June 2005 my supervisor and department head Terry Gaddis ordered me to attend a disciplinary hearing over alleged charges that were baseless and false. I do not know of any white employees who are subjected to disciplinary hearings and disciplinary measures with the same frequency or in the same manner as black employees.

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day month, and year) |
| 8/11/2005<br>Date          Charging Party (Signature) | |

EEOC FORM 5 (10/94)

# EXHIBIT

# 9

PER FORM 32
Revised 10/04

## RECOMMENDATION FOR DISCIPLINARY ACTION

Employee.  Larry Fitzpatrick

Address:  5137 Newbury Lane, Montgomery, AL  36108

Date:  1/13/06

You are herewith notified that I am recommending that you be:

☐ Suspended for _____ days

☒ Dismissed

☐ Demoted from _____ to _____

The reasons for this recommendation are: (List all charges - attach additional sheets as required)

See Attached Sheets

See Attached.

Previous Record Considered (Chronological list of prior offenses and action taken)

See Attached Sheets

See Attached.

☒  Transcripts of hearing attached

A hearing will be set by the Appointing Authority to consider this recommendation and the charges. You will be given the opportunity to respond to the recommendation and these charges at this hearing. You will be notified in writing of the hearing date and your rights at said hearing.

_____
Supervisor/Department Head

I hereby certify that this document was given to the employee ~~or placed in the United States mail~~ on

Jan          13          2006
month      day        year

_____
Supervisor/Department Head

_____
Witness

ATTACHMENT TO NOTIFICATION OF DEPARTMENTAL HEARING FOR
LARRY FITZPATRICK

CHARGE:

On or about October 17, 2005, you failed to install the required hardware to secure the
left rear brake caliper on Police vehicle 6210-2950, causing the left rear brake caliper
assembly to fall off the brake rotor and damage the caliper body, vehicle wheel and tire
and drag the ground suspended only by the rubber brake hose. Your failure to properly
install the required caliper hardware not only caused unnecessary damage to a City
vehicle, it had the potential to cause loss of life to the police officer driving the vehicle as
well as other innocent civilians and their property.

This is the third serious maintenance malpractice incident you have been responsible for
during the past year which could have resulted in catastrophic property damage or loss of
life. These three major and very serious incidents bring into question your skills and
ability to remain as an automotive mechanic for this Department.

# EXHIBIT

# 10

1             CITY-COUNTY OF MONTGOMERY

2             PERSONNEL BOARD HEARING

3

4

5    IN RE APPEAL HEARING FOR:

6       Larry Fitzpatrick,

7        Employee.

8    ————————————————————————————

9        CITY-COUNTY OF MONTGOMERY

10       PERSONNEL DEPARTMENT

11        27 Madison Avenue,

12     Montgomery, Alabama 36101

13         May 23, 2006

14           5 p.m.

15

16    BEFORE THE PERSONNEL BOARD:

17    Benita Froemming, Chairman

18    Charles B. Paterson

19    Johnny Baker

20

21

22

23    Taken by:  VICTORIA M. CASTILLO



1    these bolts get taken out?

2    We hope that once you consider

3    the evidence, once you hear the testimony

4    that we're going to present tonight,

5    you're going to reverse the Mayor's

6    decision, which was recommended by the

7    Fleet Management Department chair head,

8    and reinstate Mr. Fitzpatrick in his

9    mechanic position with the City.

10    MR. BOYLE:  Now, I call

11    Terry Gaddis to the stand, please.

12

13    TERRY GADDIS,

14    being first duly sworn, was examined and

15    testified as follows:

16

17    DIRECT EXAMINATION BY MR. BOYLE:

18    Q.    Can you state your full name

19    for the record, please, sir?

20    A.    Terry Harvey Gaddis.

21    Q.    And what is your position with

22    the City of Montgomery, Mr. Gaddis?

23    A.    I am the director of the Fleet

1    A.    Yes, it appeared that way.

2                   MR. BOYLE:   I'm going to

3    rest, and I'm going to reserve the right

4    to call him as a rebuttal witness.

5                   MS. FROEMMING:   Okay.

6

7    CROSS-EXAMINATION BY MR. GUILLOT:

8         Q.    Mr. Gaddis, in the hearing,

9    the departmental hearing that you

10   conducted, did you allow Mr. Fitzpatrick

11   to bring any witnesses?

12        A.    No, not at that hearing.   I

13   did not.

14        Q.    Okay.  So you didn't think it

15   was important to bring in Mr. White,

16   Mr. Hardy, or Mr. Edwards, who presented

17   statements regarding what they saw as

18   tampering?

19        A.    No, sir.  I read statements

20   and that was enough for me.

21        Q.    Okay.  It wasn't important for

22   you to ask questions of Mr. White.   "I

23   have experienced some tampering in my own

1    additional information?

2        A.    I don't think so.

3        Q.    You said you weren't aware of

4    the reports of sabotage until really the

5    Mayor's hearing, but indeed you were aware

6    that there have been some other reports,

7    correct?

8        A.    That's tampering -- that's not

9    sabotage.  There's a difference.

10        Q.    So as soon as you use the word

11    sabotage, it's not sabotage.  It was

12    tampering.  If a police officer goes out

13    and gets in a wreck because someone

14    tampered with a brake line, is there any

15    difference between sabotage and tampering?

16        A.    Let me rephrase and retract my

17    last statement.  Tampering is probably not

18    a good word.  It was petty theft.

19            MR. GUILLOT:  I don't have

20    any further questions.

21            MR. BOYLE:  No follow up.

22    Call Royce Albright.

23

1      MR. ALBRIGHT:  I would be

2  happy to leave.

3      MR. BOYLE:  Technical

4  advisory in case they get over my head.

5

6      CHARLIE CRUMB,

7  being first duly sworn, was examined and

8  testified as follows:

9

10  DIRECT EXAMINATION BY MR. GUILLOT:

11      Q.   State your name, please.

12      A.   Charlie Crumb.

13      Q.   And, Mr. Crumb, what is your

14  occupation, please?

15      A.   I am employed with McGriff

16  Auto, 1621 Bell Street, as a mechanic.

17      Q.   Okay.  How long have you been

18  there?

19      A.   Since 2003.

20      Q.   Since when, I'm sorry?

21      A.   2003.

22      Q.   Prior to that where did you

23  work?

1      Q.     Okay.  All right.  And let's

2   say someone installed the caliper but

3   didn't put the bolts in and then they took

4   it for a test-drive.  Are they going to be

5   able to detect something with regard to

6   that particular tire or the braking system

7   on that tire?

8      A.     Yes.  It is possible because

9   the positioning of the rear brake caliper

10  is behind the -- is placed on the rear

11  portion of the wheel and on braking it's

12  pulled forward.  And any time you apply

13  the brakes, you should hear some type of

14  noise.

15     Q.     Now, I'm saying, now, if the

16  bolts were not installed.

17     A.     If they were not installed,

18  you should have some type of noise.

19     Q.     Would that be easily

20  detectable from the inside when you are

21  driving the vehicle?

22     A.     To me it would because when I

23  work -- do work on a specific part of that

1    vehicle if I'm test-driving, I'm listening

2    for any type of strange noises coming from

3    that particular portion of the vehicle.

4         Q.    Now, let's say these bolts are

5    not installed and this vehicle is going

6    around town.  Is it possible for that

7    caliper to come out of its position and

8    fall under the vehicle?

9         A.    No it is not possible, simply

10   because in 1974, Ford was innovating disk

11   brakes.  Ford redesigned that wheel from a

12   drum brake to a disc brake wheel, making

13   it -- changing it from a two-degree offset

14   to a five-degree offset which would put

15   the wheel over the caliper, and that was a

16   safety factor.

17        Q.    The fact that the wheel is

18   over the caliper, why does that -- how

19   does that prevent it from falling out?

20        A.    The wheel is only at the most

21   about a quarter of an inch above the

22   caliper and that caliper has to move not

23   less than three inches to be removed from

1    the bracket.

2        Q.    Let me ask you this -- if a

3    vehicle was just sitting out on a ready

4    line after it had been worked on, after it

5    had been repaired, after it had been

6    tested, is it possible for someone to go

7    out and take those bolts out of the

8    retainer bracket on the calipers?

9        A.    Yes, it's possible.

10        Q.    It is possible.  How long do

11    you think it would take to remove those

12    bolts?

13        A.    Less than five minutes.

14        Q.    Mr. Fitzpatrick did the work

15    on the vehicle on the 17th, I believe, of

16    October of 2005.  The vehicle was not

17    brought back until the 20th of October

18    2005.  Do you think the driver would have

19    noticed a problem before three days later?

20        A.    Should have.

21        Q.    Okay.  Now, let's talk about

22    the Hatseal incident.  You said earlier

23    you're familiar with the fuel pump

1    placement and Hatseal on a Chevy Blazer
2    2002.  Should a mechanic always replace a
3    Hatseal when he's replacing a fuel pump?
4         A.    That is mainly a judgment
5    call.  If you -- for instance, if a fuel
6    pump has been replaced recently it already
7    has a new seal on it, and the seal should
8    be checked for deterioration.  If there is
9    no deterioration, the seal can be reused.
10        Q.    Would it be a bad policy to,
11   say, replace the seal every time you
12   replace a fuel pump?
13        A.    No, it's not a bad policy.
14        Q.    Would the fuel pump seat
15   properly if the Hatseal was not present?
16        A.    It would seat but not seal.
17        Q.    So when an operator -- let's
18   say I'm the operator.  I go fill up my
19   tank with gas.  What's going to happen
20   with the gas going to that fuel tank?
21        A.    You should -- upon the tank
22   being filled, you should get an overflow,
23   noticeable.

1    Q.    How are you going to notice
2  that overflow?
3    A.    Well, you're standing right
4  there next to the tank.  When it starts to
5  overflow, it should be noticeable.  It
6  should run out around your feet.  So if
7  you're standing right there next to it.
8    Q.    Okay.  Would you also detect
9  an odor?
10    A.    You should detect a fresh gas
11  odor.
12    Q.    Okay.  Would it take six weeks
13  before the operator would have to bring it
14  in because of the smell of gas?
15    A.    I would think not unless the
16  operator is just, you know, sense of smell
17  is that bad that he can't smell fresh gas.
18    Q.    If that vehicle was brought
19  into the shop for another issue in that
20  six week time frame, do you think the
21  mechanics would have probably noticed the
22  gas smell?
23    A.    Yes, they should have because

1    on a PM inspection that is part of it.

2          Q.    As to the wheel lugnuts, if a

3    mechanic such as Mr. Fitzpatrick changes

4    the four tires on a van and then

5    test-drives that van, you think he's going

6    to notice it if four, three or four, of

7    the lugnuts are missing?

8          A.    Something of that nature would

9    be noticed right off because the weight of

10   a vehicle versus one nut will not hold

11   that wheel on there, or two, and you're

12   going to get a noise, say, within a mile

13   or so.

14         Q.    So if he -- if he puts the

15   wheels on, he drives it around the shop a

16   couple of times --

17         A.    He should get some kind of a

18   noise.

19         Q.    Now, if he has done this and

20   then after he parks the vehicle on the

21   ready line -- and you're familiar with

22   what a ready line is on that?

23         A.    Yes.

1    These occurred prior to or during that

2    time, so under the advisement of our

3    office of the -- I don't know.  I wasn't

4    there at the time -- everything was held

5    until EEOC finished their investigation

6    and a settlement was reached in that --

7    and that's when after that this charge was

8    brought as counter towards that.  He was

9    instructed not to bring those up six

10   months after, plus right after EEOC.

11   There was no good time to bring those up

12   and then he had this incident come up --

13   so then everything was brought forward.

14                  MR. BAKER:  Thank you.

15                  MR. GUILLOT:  Any other

16   questions?

17

18                  ROBERT L. SHUFORD,

19   being first duly sworn, was examined and

20   testified as follows:

21

22   DIRECT EXAMINATION BY MR. GUILLOT:

23       Q.    Would you state your name,

1    instructed not to turn the police radios

2    off so we turn we turn them down low --

3    especially when we listen for noise, we

4    turn them off.

5        Q.    So you're specifically

6    listening for noise.  Is that right?

7        A.    Yes, sir.

8        Q.    If Mr. Fitzpatrick had not

9    properly bolted in this caliper, do you

10   expect he would have heard some noise that

11   would have indicated that?

12       A.    Yes, sir.

13       Q.    What do you think he would

14   have heard?

15       A.    He would have heard -- the

16   moment he applied the brake, you would

17   have heard a grinding noise because if the

18   caliper is loose, it would have jumped up

19   against the inside of the wheel.

20       Q.    Would it have adversely

21   effected the steering or the braking as

22   you applied the brakes?

23       A.    No.  You would have just heard

1    a noise.  It just would have been a noise.

2         Q.    Now, sir, you're aware that

3    that vehicle came back in a few days

4    later, correct?

5         A.    Yes.

6         Q.    When you saw the vehicle,

7    would you describe what you saw when you

8    came in that morning, I believe it was the

9    21st of October?

10         A.    Well, Mr. Pierce came to me --

11    I was walking through the shop and he came

12    to me and said he had just pulled a car

13    around that had the brake caliper hanging

14    loose.  So I went and I looked.  Then I

15    went in the office just to see if the car

16    been in recently, and I saw -- I pulled up

17    the job order summary and I saw that

18    Mr. Fitzpatrick had worked on the car.  So

19    I gave Mr -- told Mr. Fitzpatrick to pull

20    the car in on the front end and let's see

21    what happened --

22         Q.    Let me stop you there.  Was it

23    the garage's policy to bring in the

1    mechanic who did the work?

2         A.    Yes, sir.

3         Q.    Okay.  Go ahead.

4         A.    Then, I proceed -- I went back

5    into the office and I was sitting down at

6    the computer to print the job summary up,

7    and Mr. Albright walked in and he asked me

8    what was wrong with 2950.  And I told him

9    that the brake caliper was loose.  And he

10   said, well, let's go out and take a look.

11   And I said, well, I want to finish

12   printing the job order and we went out --

13   proceeded out to the car and

14   Mr. Fitzpatrick was standing there.  And

15   he said, well, the brake caliper is

16   hanging underneath the car.  Then,

17   Mr. Albright told him not to touch it.  He

18   was going to get somebody else to look at

19   it after further investigation, told him

20   not to touch the car.

21        Q.    Okay.  You said that the brake

22   caliper was hanging underneath the car.

23        A.    Yes, sir.

1    Q.    From what you know of the
2  mechanics or the way the Crown Vic is
3  built with the tire, with the left-rear
4  tire, can it fall out of there?
5    A.    No, sir.
6    Q.    So it's impossible
7  mechanically, physically because of the
8  way the thing is built to fall out?
9    A.    Yes.
10    Q.    Have you checked that out
11  since -- since Mr. Fitzpatrick's hearing?
12  Have you gone and looked to see if it's
13  possible for that to fall out?
14    A.    Yes, sir.  I have tried
15  physically to take it out.  It would not
16  come out unless the wheel was removed.
17    Q.    Okay.  Isn't it true, sir,
18  that -- well, let me move on to something
19  else.  With regard to -- you're familiar
20  with the Hatseal incident, correct?
21    A.    Yes.
22    Q.    I mean, you testified at the
23  earlier hearing about the Hatseal

1  the ramp, and he drove around the

2  maintenance compound maybe one or two

3  laps.  Then he backed the vehicle into the

4  slot down on the ready line where we park

5  the vehicles.  Then, I imagine, after

6  lunch maybe around two o'clock, or

7  something like that, the operator came and

8  got in the vehicle and he started past

9  where the wash rag -- a person is out

10  there washing a car -- and they stopped

11  him and told him his wheel, the left

12  wheel, was loose.  The operator came in

13  and told me that the wheels were loose.  I

14  went and got Mr. Fitzpatrick and told him

15  to go look and see what the problem was.

16  He came back and said that the lugs were

17  loose, that they couldn't have been loose

18  because he drove the vehicle around the

19  lot.  So I told him to walk around the lot

20  and see if you see any lugs.  And he and

21  Mr. White walked around the lot, couldn't

22  find any lugs but when they went down --

23  they went down where the vehicle was

1 looked at those and I had all the

2 information.  You can line it all up --

3 then you can get the dates.

4   Q. Did you not do the same thing

5 for this brake caliper issue?

6   A. Yes, I did.

7   Q. But, again, whether or not you

8 went on the test-drive is fuzzy to you?

9   A. Like I said, I don't

10 remember.  All I know the car was driven

11 because that's the policy.  I can't say I

12 sat in the car, whether I drove the car.

13   Q. How many accusations of

14 sabotage did you actually take to

15 Mr. Royce Albright, your supervisor?

16   A. Actually, two.

17   Q. Was that involving Mr. Johnny

18 White?  Is that correct?

19   A. Johnny White?

20   Q. Mr. White.

21   A. Mr. White.

22   Q. Was that a theft or was it a

23 sabotage?

1      A.    Somebody tampered with the
2   work.
3      Q.    Did somebody tamper with the
4   work, or did some of his parts come up
5   missing?
6      A.    Somebody tampered with his
7   work.  He was putting the part back
8   together and somebody tampered with it.
9      Q.    When the fuel -- when this
10  fuel tank, Hatseal incident happened, you
11  stated that Mr. Albright and Mr. Smith
12  went to lunch.  Who else went to lunch at
13  that same time?
14     A.    Mr. White, Mr. Fitzpatrick --
15     Q.    Who was left in the shop on
16  the light duty side?
17     A.    Myself and Mr. Thomas,
18  Mr. Smith.
19     Q.    You just said Mr. Smith went
20  to lunch?
21     A.    We got two Smiths.
22     Q.    I wanted to clarify.  When
23  they came back, did they all come back at

1       A.    It is.

2       Q.    I want you to pick that up and

3   put it against that wheel, how it would

4   mount to that wheel.  If you can turn it

5   and show the Board, please, if you would.

6   Now, it's your testimony that a caliper

7   will not fit out of that opening, is that

8   correct?

9       A.    If it's mounted and --

10              MR. BOYLE:  That's all I

11  have.  Everybody has seen what they need

12  to see.  Thank you.

13              MR. GUILLOT:  I think that

14  his actual testimony was it would not fall

15  out of --

16              THE DEPONENT:  Wouldn't

17  fall out.

18              MS. FROEMMING:  Thank you,

19  Mr. Shuford.

20              MR. GUILLOT:  Thank you,

21  Mr. Shuford.

22

23              RONNY EDWARDS,

1   being first duly sworn, was examined and

2   testified as follows:

3

4   DIRECT EXAMINATION BY MR. GUILLOT:

5          Q.   State your name, please.

6          A.   Ronny Edwards.

7          Q.   Okay.  Mr. Edwards, where are

8   you employed?

9          A.   City of Montgomery Sanitation

10  Department.

11         Q.   What do you do for the City of

12  Montgomery Sanitation?

13         A.   I'm a supervisor.

14         Q.   Okay.  Sir, was there an

15  occasion that you had brought a vehicle

16  into the city garage?

17         A.   That's correct.

18         Q.   What kind of vehicle was that?

19         A.   It's a Dodge Ram.

20         Q.   Okay.  Like a van or --

21         A.   It's a pick-up.

22         Q.   Pick-up truck.  Okay.  And

23  were you shown something in particular

1  about this pick-up truck by

2  Mr. Fitzpatrick?

3      A.    Yes, I did.

4      Q.    Will you describe what he

5  showed you?

6      A.    He showed me about the back

7  rear where the brake and the brake --

8  where the line or whatever -- I'm not a

9  mechanic but I know brakes.  But he showed

10 me that a line was loose.

11     Q.    A line was loose on the rear

12 brake?

13     A.    That's correct.

14     Q.    Did he tell you why that line

15 was loose?

16     A.    He told me -- when I came in,

17 I had came in to check to see was my

18 vehicle ready, but I seen it still up with

19 no tires on it.  But I didn't see nobody

20 working on it.  When I left I saw

21 Mr. Fitzpatrick came, and he told me when

22 he looked at the vehicle -- because he

23 must have looked at it after I left and he

1    caught me leaving and he brought me back

2    to show me that someone was tampered it

3    because he said he saw everything hooked

4    up to the brakes and whatnot.

5         Q.    Isn't it true, sir, that you

6    gave a statement regarding that incident?

7         A.    That's correct.  Yes, sir.

8         Q.    Who did you gave that

9    statement to?  Was it Mr. Fitzpatrick,

10   Mr. Shuford or --

11        A.    Mr. Fitzpatrick.

12        Q.    Okay.  I'm going to ask that

13   you take a look at that statement, is that

14   yours?

15        A.    That's correct.

16                  MR. GUILLOT:  Show this to

17   the Board.

18        Q.    So Mr. Fitzpatrick showed you

19   that for the purpose of showing you that

20   someone had tampered with your vehicle?

21        A.    Yes.

22                  MR. GUILLOT: Okay.  I have

23   no further questions.

1   why you didn't come back with the vehicle?

2        A.    No.

3                    MR. BOYLE:  That's all I

4   have.

5                    MR. GUILLOT:  No further

6   questions.

7                    MS. FROEMMING:  All

8   right.  Thank you, Mr. Edwards.

9

10                   THOMAS M. MCLEOD,

11  being first duly sworn, was examined and

12  testified as follows:

13

14  DIRECT EXAMINATION BY MR. GUILLOT:

15        Q.    Would you state your name?

16        A.    Thomas M. McLeod.

17        Q.    Where do you work, sir?

18        A.    City garage.

19        Q.    Okay.  Is that the City of

20  Montgomery?

21        A.    Yes, sir.

22        Q.    Okay.  How long have you

23  worked there?

1    Q.    (MR. GUILLOT)  Did you at some

2    point turn the motor over and make sure

3    whatever was in fell out?

4                    MR. BOYLE:  Are you going

5    to testify for him or let him answer the

6    question?

7                    MR. PATERSON:  That train

8    is loud.

9    A.    I did want the engine around

10    to get extra parts that I needed to swap

11    over.

12    Q.    (MR. GUILLOT)  Aside from that

13    incident, have there ever been any other

14    incidents in which you considered someone

15    tampering with your work?

16    A.    No, sir.

17    Q.    Okay.  Wasn't there a

18    situation -- and this is not regarding

19    tampering but -- was there a situation

20    where you had to repair some work that

21    Johnny Smith had just repaired?

22    A.    Yes, sir.

23    Q.    Was that involving a fuel

1    tank?

2        A.    It was the fuel lines.  Yes,

3    sir.

4        Q.    Can you tell the Board what

5    had occurred causing your repair?

6        A.    A vehicle came in for a fuel

7    pump job, and it came back a day later

8    that it wouldn't run.  Well, what it was

9    doing it was flooding.  He had pinched or

10   kinked a fuel line and the fuel wouldn't

11   return into the tank.  It was flooding the

12   engine.

13       Q.    So you were repairing that?

14       A.    Yes, sir.

15                MR. GUILLOT:  No further

16   questions.

17

18   CROSS-EXAMINATION BY MR. BOYLE:

19       Q.    Mr. McLeod, on this engine

20   that you were pulling, after you pulled

21   the intake and the induction system, did

22   you put any -- in the intake valve

23   cylinders?

160

1          A.    Yes, sir.

2          Q.    Is it possible that the bolt

3    that fell into the Number 8 cylinder was

4    actually a bolt that you dropped and not

5    somebody else?

6          A.    Could have.

7                MR. BOYLE:   That's all I

8    have.

9                MR. GUILLOT:   No further

10   questions.

11               MS. FROEMMING:   Okay.

12   Thank you.

13

14               DONALD WHITE,

15   Being first duly sworn, was examined and

16   testified as follows:

17

18   DIRECT EXAMINATION BY MR. GUILLOT:

19         Q.    Would you state your name,

20   please?

21         A.    Donald White.

22         Q.    And where do you work, sir?

23         A.    City of Montgomery, Fleet

1   wheel.  And I think when I saw it,

2   Mr. Fitzpatrick was out there checking it

3   and I walked out to look.  And there was,

4   I think, one lug still on the rim.  And so

5   he walked, you know, backtracked down

6   towards the ready row, and he found the

7   other lug somewhere in that area.

8         Q.    In your experience -- you're a

9   mechanic, right?

10        A.    Yes.

11        Q.    In your experience could that

12  vehicle have been driven from

13  Mr. Fitzpatrick's maintenance bay to the

14  ready row in that condition?

15        A.    I don't think so.  And, see, I

16  helped him -- after he found the lugs, I

17  helped him put the lug back on and tighten

18  the wheel up.  In my opinion, if that

19  vehicle had been driven from where

20  Mr. Fitzpatrick worked and the maneuvering

21  and stuff that he had -- and all the turns

22  and stuff he had to make to get to the

23  ready row, it would have messed the

1    threads up on the studs that hold the

2    wheel on.  All of those studs, it would

3    have messed the threads up where you

4    couldn't get the lugnuts back on and that

5    wasn't the case because he put the lugnuts

6    back on without any problem and tightened

7    the wheel up.  And then the driver came

8    and picked the van up and left with it.

9        Q.    So, in your opinion, were the

10   nuts taken off only on the ready row?

11       A.    I don't know where they was

12   taken off at, but I know that the vehicle

13   wouldn't have been able to been driven

14   from Point A to Point B without doing some

15   major damage to the lugnuts.

16                 MR. GUILLOT:  No further

17   questions.

18

19   CROSS-EXAMINATION BY MR. BOYLE:

20       Q.    Mr. White, on that van if five

21   lugnuts were on there but not totally

22   torqued down, would the vehicle be able to

23   be driven?

1          A.    Restate that question.

2          Q.    Let's say they were

3    fingertight -- all five of the lugnuts

4    were fingertight.  Would they have been

5    able to be driven then for a short period

6    of time without noticing that the wheel

7    was loose?

8          A.    It could have been driven.

9    But from the point where he left and drove

10   the vehicle, if those lugnuts had been

11   fingertight or loose in any way, it would

12   have did some major damage to the studs.

13         Q.    Now, you're saying when he

14   drove, when who drove, who is he?

15         A.    Mr. Fitzpatrick.

16         Q.    All right.  So you're saying

17   that, assumingly, that the lugnuts were

18   tight once they went to the ready line

19   because there was no damage to the studs,

20   is that correct?  Is that what you were

21   saying?

22         A.    That's what I was saying.

23         Q.    But there wasn't any damage to

1  brake fluid on the floor?

2      A.    Yes.  Puddle of brake fluid

3  and the lines was loose.

4      Q.    Now, we just heard testimony

5  from someone in Sanitation that it was his

6  truck that the brake line was loosened

7  on.  Was that the same truck we're talking

8  about?

9      A.    Yes.

10     Q.    Was he there when you walked

11 in?

12     A.    I didn't see him, no.

13     Q.    Did you ever see him walk into

14 the shop?

15     A.    Yeah.  I had seen him that

16 same day.  Yes.

17     Q.    About how long?

18     A.    I can't quite remember.

19     Q.    Fifteen minutes, an hour?

20     A.    I don't know.

21             MR. BOYLE:   That's all I

22 have.

23             MR. GUILLOT:  No further

```
 1   right.  Thank you.

 2

 3                 RODNEY HARDY,

 4   Being first duly sworn, was examined and

 5   testifed as follows:

 6

 7   DIRECT EXAMINATION BY MR. GUILLOT:

 8        Q.    Would you state your name,

 9   please?

10        A.    Rodney Hardy.

11        Q.    And where are you employed,

12   sir?

13        A.    City of Montgomery.

14        Q.    How long?

15        A.    It will be six years in

16   October.

17        Q.    Okay.  And what do you do for

18   the City of Montgomery?

19        A.    Auto mechanic.

20        Q.    Okay.  Have you ever had any

21   reason to believe somebody had tampered

22   with work that you were doing?

23        A.    Well, I know one day
```

1    questions.

2                    MS. FROEMMING:  Thank you,

3    Mr. Hardy.

4                    MR. GUILLOT:  Call

5    Mr. Fitzpatrick.

6

7                    LARRY FITZPATRICK,

8    being first duly sworn, was examined and

9    testified as follows:

10

11   DIRECT EXAMINATION BY MR. GUILLOT:

12        Q.    Would you state your name for

13   the record, please?

14        A.    Larry Gilbert Fitzpatrick.

15        Q.    And, Mr. Fitzpatrick, are you

16   currently employed?

17        A.    No, I'm not.

18        Q.    Okay.  And where were you

19   previously employed?

20        A.    City of Montgomery Garage

21   Department, Fleet Management.

22        Q.    How long were you there?

23        A.    Fifteen years.

1        Q.    Okay.  And were you a

2   mechanic?

3        A.    Yes, sir.

4        Q.    Isn't it true you also served

5   in the military?

6        A.    Yes, sir.  For ten years, ten

7   years in the army.

8        Q.    All right.  You just heard

9   Mr. Hardy testify about Mr. Edwards'

10  truck.  Would you tell the Board why it is

11  that you asked Mr. Hardy to take a look at

12  it before lunch and then again after

13  lunch?

14       A.    Because I have had so many

15  problems of vehicle getting tampered with

16  and I needed someone to witness all of

17  this stuff that going on.

18       Q.    Okay.  And had you reported

19  this tampering to anybody before?

20       A.    Mr. Shuford numerous occasions

21  and plus I showed employees over the

22  months, stuff that I either went on break

23  or went to lunch and came back and

1    discovered, you know, brake line loose,

2    wheel lugs loose, brake -- master cylinder

3    caps off of master cylinders, stuff of

4    that nature.

5        Q.    Okay.  Now, earlier you heard

6    Mr. Shuford testify about the check marks,

7    and we showed the check mark on this

8    particular tire.  Were you told to put

9    check marks just when you tightened

10    lugnuts or was that some of the general

11    thing that you do?

12        A.    There was something, you know,

13    that I started doing after, you know, I

14    discovered that work been getting tampered

15    with -- you know, to insure me that any

16    time I tighten up on wheel lugs, brake

17    calipers, or bolts, or anything, that all

18    nuts, bolts are fastened, are secured --

19    and so I started checking the tires

20    inside.

21        Q.    Okay.  And so the check mark

22    on this tire, what did that indicate?

23        A.    That all nuts, bolts are

1    fastened and secured.

2        Q.    I think you said it would

3    include calipers?

4        A.    Right.

5        Q.    Okay.   Tell the Board about

6    the -- your involvement with the brake

7    caliper situation.

8        A.    After I tightened up the

9    caliper bolts -- first the vehicle came

10   back, it was about the 10th that

11   Mr. Stanton worked on it, and so I got it

12   on the 17th of October of 2005, I

13   believe.  But, anyway, I informed

14   Mr. Shuford, I said that this vehicle

15   already have new pads and rotors on it,

16   what you want me to do with it.  And

17   Mr. Shuford told me to, well, I didn't

18   write the work order, you need to check

19   with Mr. Albright and see what he want

20   done on it.  So I went to Mr. Albright and

21   Mr. Albright he informed me to change all

22   hardwares and stuff, so that's what I

23   done.  And after I finished, you know,

1    putting all the hardwares on, securing the

2    brake caliper bolts, and securing the

3    tires and everything, you know, I marked

4    the tires before I even let the vehicle

5    drop back down on the floor, I always mark

6    my tires.  I, normally you know, all the

7    time put check marks on the tires inside.

8    Sometimes I put a triangle, you know, I

9    try to change it up, you know.  And

10   sometimes I puts a circle.  You know, so I

11   just use different kind of marks to

12   identify that all nuts and bolts are

13   fastenened and secured.  So I let the

14   vehicle down on the floor and I called for

15   Mr. Shuford -- and I believe it was

16   Mr. Shuford because Mr. White, if I'm not

17   mistaken, he was on vacation at the time.

18   But, anyway, I always know -- follow

19   operation procedure, City policy, to

20   always carry a supervisor with me on the

21   road test unless the supervisor instructs

22   me to take a mechanic.  But normally I

23   always carry a supervisor with me on the

1  road test.  So we went out and we

2  test-drove the vehicle.  And normally in

3  the process of going down the road, I

4  slammed on brakes numerous times, you

5  know, before I, you know, bring it back to

6  the City lot.  Plus we have drove that

7  vehicle at least about 10 miles or so

8  before we returned it back to the lot.

9  And we didn't hear no noise or anything

10  because we don't have the radio on.  Being

11  a mechanic 35 years, I would have been

12  able to detect if the brake caliper had

13  been loose on that vehicle because you'd

14  have heard roughness, you know, like metal

15  to metal.  We didn't hear any noise, so,

16  everything was fine so I put the vehicle

17  on the ready line.  We park it on the

18  ready line.  Normally, when I park it on

19  the ready line, the supervisor,

20  Mr. Shuford, he normally ride to the ready

21  line with me and we will get out -- but

22  Mr. White, I normally drop him at the body

23  shop because he have bad feets and

1   pump, right?

2       A.    Right -- by the work order.

3   Says fuel leak, whether or not he worked

4   on the pump or not -- but it says fuel

5   leak.

6       Q.    That is actually about six

7   weeks after you worked on the fuel pump?

8       A.    Pretty much -- five or six

9   weeks.  Pretty much so.

10      Q.    Okay.  Now, let's recall the

11  lugnut incident.  Tell the Board what you

12  recall about the lugnut incident.  I

13  believe that occurred on October 15th of

14  2004.

15      A.    Okay.  On that particular

16  vehicle as I recall, after finishing the

17  maintenance on that vehicle and tightening

18  the wheel lugs and stuff, I pulled back

19  the vehicle off the front-end rack.  I had

20  it on the front-end rack.  I backed it off

21  and I made numerous a turn.  And once I

22  got back on the road on the lot, I drove

23  that vehicle down straight down to

maintenance and I slammed the brakes and
then I also drove that vehicle around the
building a couple of times before I placed
that vehicle on the ready line. And after
lunch -- when I got back after lunch, the
operator came and picked that vehicle up.
And he got as far as the ready line all
the way to the car wash, the left front
was wheel about to fall off the vehicle.
Mr. Shuford he approached me in the shop
and asked me did I tighten the lugnuts on
the vehicle. And I said, "Of course I
did." He said, "Is that the operator came
and reported said that the wheel about to
run off." He said, "You need to go out
there and walk around the build to try to
find the lugs and check and see what's
going on with the vehicle and fix the
vehicle." And so I -- Mr. White said,
"Come on. I'll help you put the lugnuts
back on." Mr. Donald Knight said, "It's a
jack over there." And we didn't see the
jack. I looked for the jack. I couldn't

1  find the jack.  So Mr. White already had

2  walked out toward the vehicle, so I called

3  on Mr. White.  And when we got there to

4  the vehicle, we noticed that there wasn't

5  very many lugs on the vehicle.  It could

6  have been one or two.  It had been a

7  while, but I believe it was two lugnuts on

8  the vehicle.  Well, it could have been

9  one.  And then I walked the pass on the

10  ready line and I noticed that the other

11  lugnuts was at the left rear tire where

12  the vehicle was backed into the ready

13  line.  But it was the left front tire that

14  allegedly supposed to have been running

15  off the vehicle.

16                 MS. FROEMMING:  Can I ask

17  you something, what was the original work

18  order on this car?

19                 THE DEPONENT:  A PM, if

20  I'm not mistaken.  It was a preventative

21  maintenance.  That's thoroughly checking

22  the vehicle out.

23                 MS. FROEMMING:  That's

1    everything?

2                         THE DEPONENT:  That's

3    everything.

4                         MR. BOYLE:  Give her a

5    second to change the paper.

6         Q.    (MR. GUILLOT)  Wasn't it, in

7    fact, to change the tires?  I think you

8    had replaced the tires, hadn't you?

9         A.    Well, if it needed replacing,

10   I done it -- whatever it took to repair

11   the vehicle.  It was a thorough

12   inspection.  If it had to come in, if I

13   had to do the brakes, I would have done

14   that or whatever.  That's what a PM

15   consists of.

16                         MR. GUILLOT:  There is the

17   job order for that.  Thank you.

18        Q.    (MR. GUILLOT)  Isn't it true

19   that indicates --

20                         MR. BOYLE:  Joe, that

21   wasn't included in your documents, was it,

22   that you sent over?

23                         MR. GUILLOT:  Yes, it was.

1           MR. BOYLE:  That's not in

2   the stack you sent back to me though,

3   right?

4           MR. GUILLOT:  No.

5       A.    What was the question?

6       Q.    (MR. GUILLOT)  Okay.  What --

7   you were asked what the work order was for

8   that, and I just wanted you to correct

9   that?

10      A.    What date was that done on?

11  I'm trying to--

12      Q.    October of '04.

13      A.    October -- October '04,

14  replace all tires.  Yeah, it could have

15  been that, right, replaced tires.

16      Q.    How can you explain the

17  lugnuts being behind the left rear tire on

18  the ready line?

19      A.    I can't explain it -- it's a

20  mystery to me -- I can't explain that.

21      Q.    Okay.  In your opinion what's

22  the only way that those lugnuts could have

23  been where they were?

1    A.  In my opinion someone had to

2 take them off there and threw them back

3 there by the tire.

4    Q.  Okay.  Did you do it?

5    A.  No, sir.

6    Q.  You think somebody else must

7 have done it?

8    A.  Well, I hate to accuse someone

9 of doing it -- but I know I didn't do it,

10 so that's the only way that it could have

11 got there.

12    Q.  When you did the work on the

13 brake caliper, you road-tested it,

14 correct?

15    A.  True.

16    Q.  Did it test okay?

17    A.  Yes, sir.

18    Q.  And where did you put it after

19 you road-tested it?

20    A.  We placed it on the ready

21 line.  I backed it up on the ready line.

22    Q.  Okay.  And you heard testimony

23 earlier that it would have been possible

1    for someone to go and take those
2    pertaining bolts off of there, correct, on
3    the ready line?
4         A.    You said it would have been
5    possible?
6         Q.    Uh-huh.
7         A.    True.  That's right.
8         Q.    So it's entirely possible you
9    could have done the work and then somebody
10   tampered with it?
11        A.    That's possible.
12        Q.    Did you report tampering to
13   Mr. Shuford?
14        A.    Yes, sir.
15        Q.    Did you ever report it to
16   Mr. Albright?
17        A.    No, sir.  The reason why
18   because every time I go to Mr. Albright's
19   office, I'm always getting written up.  He
20   never believed nothing I said up until
21   this point -- he never believed nothing.
22   I'm always, you know, lying to him for
23   some reason or another.  I don't know.

```
 1              C E R T I F I C A T E

 2

 3    STATE OF ALABAMA   )

 4    MONTGOMERY COUNTY )

 5            I hereby certify that the above

 6    and foregoing proceedinging was taken down

 7    by me in stenotype, and the questions and

 8    answers thereto were transcribed by means

 9    of computer-aided transcription, and that

10    the foregoing represents a true and

11    correct transcript of the proceeding given

12    by said witness upon said hearing.

13            I further certify that I am

14    neither of counsel nor kin to the parties

15    to the action, nor am I in anywise

16    interested in the result of said cause.

17

18         VICTORIA M. CASTILLO, COURT REPORTER

19

20

21

22    My Commission Expires

23    May 19, 2010
```



# EXHIBIT

# 11

To: Mr. Terry Gaddis, Director Fleet Management
From: Mr. Robert L. Shuford, Master Mechanic
Re: Mr. Larry Fitzpatrick
**Date: December 19, 2005**

Mr. Larry Fitzpatrick have been accused of leaving wheel lugs loose, leaving an O ring off of a fuel tank and now leaving bolts out of a caliper. When Mr. Fitzpatrick was accused of leaving the wheel lugs loose, I wrote a letter stating the facts that it was impossible for that vehicles lugs to be loose under the condition the vehicle was driven, however, when I presented the letter to you Mr. Gaddis, you did not believe I knew what I was talking about, threatened to fire me and would not accept the letter and requested I write what you wanted to hear.

Since that day January 11, 2005, I suggested to Mr. Fitzpatrick to double check his wheel lugs and mark them. When Mr. Fitzpatrick started marking the wheel lugs, he have showed me on two occasions where someone loosened the lugs on the vehicle he was working on. However, when the person realized that the lugs were marked, the tampering with the lugs stopped.

On March 30, 2005 after I returned from lunch, Mr. Fitzpatrick called me over to 5000-3003 and showed me that the brake line had been loosened. Mr. Fitzpatrick had no need to loosen the brake line to install brake pads and since this incident of tampering Mr. Fitzpatrick stated he would double check his work on brakes and marks the tires when he finished.

Mr. Fitzpatrick is not the only one that has had tampering with his work. Mr. White was working on 6210-2713 repairing the front end and his bushing for the center link; nut and washing for the shock came up missing. He reported it to me and Mr. Albright and Mr. Albright said he was not the only one that had reported tampering with their work. However, Mr. Albright may have thought tampering with work in progress was just a practical joke.

We have had a problem since January 11, 2005 with someone tampering with Mr. Fitzpatrick work, but no one in the front office seemed to care, even when I reported it. Now here we are again with more tampering that could have been serious, you are to blame Mr. Fitzpatrick, but there is no way that those bolts could have been left out of the caliper when the mechanic and a master mechanic drove the vehicle. We simply need to find out who is tampering with other people's work and take appropriated actions.

Instead of taking pictures of the wheel that the bolts were missing from, we should have had the wheel finger printed, I have been working and supervising maintenance for over 35 years and I have never seen where bolts are missing on a caliper, loose but not missing.

Signed: Mr. Robert L. Shuford

NOTARY PUBLIC STATE OF ALABAMA AT LARGE    *NOTARY*
MY COMMISSION EXPIRES: June 15, 2008

To: Mr. Terry Gaddis, Director Fleet Management
From: Mr. Donald White
RE: Mr. Fitzpatrick Case

Date: December 19, 2005

I'm making this statement on behalf of Mr. Fitzpatrick. He has come to me on two or
more occasions and showed me brake lines that had been loosened on vehicles that he
was working on. Also, I saw the vehicle that the lugs were loose and helped Mr.
Fitzpatrick reinstall the lugs. We walked the same path that the vehicle traveled and did
not find any of the lugs, so we looked in the place where the vehicle was parked and
found the lugs in the rear where the vehicle was parked, but the vehicle left front wheel
was missing the lugs.

I have experience someone tampering with my work in process. I was working on 6210-
2713 repairing the front end and I went for my morning brake and when I came back the
center link bushings, shock washer and nut were missing. I reported this incident to Mr.
Shuford and he told me to make sure I tell Mr. Albright. I went and told Mr. Albright and
he said you are not the only one this has been reported to him before.

Signed: Mr. Donald White

NOTARY

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 15, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

12-16-05

I Ronnie Edwards witness a brake
lmestoosen on 5000-3003 that Fitzpateic
brought to my attention before the
work was complete between Month
of Oct. or Nov. 2005.

Ronnie Edwards

Nila L. Darby
NOTARY

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: June 15, 2008
BONDED THRU NOTARY PUBLIC UNDERWRITERS

To: Mr. Terry Gaddis, Director, City Fleet Maintenance Dept.
From: Larry Fitzpatrick, Mechanic, Auto Light Division
Date: 11/10/05
Subject: Response to charge of maintenance malpractice

I deny that I left any bolts or other hardware loose or uninstalled on Police vehicle 6210-2950. The record shows that I worked on the vehicle on 10/17/05. My procedure for guaranteeing that the lug nuts and other fasteners have been secured is to put a check mark on each tire immediately after I have done the work. You can clearly see the check mark on the tire in the picture you provided me with.

Furthermore, after the work was completed, Supervisor Robert Shufford and I took the vehicle on a test drive from the City Lot, down North Ripley, and on to the Northern Bypass, and then returned to the lot. Several times during that test drive, I applied pressure to the brakes to ensure that everything was working properly. There were no apparent problems. Mr. Shufford and I then returned the vehicle to the Ready Line. If anything was wrong, it did not occur on my watch. Again, as I have stated in the past, I have on several occasions mentioned to Mr. Shufford my suspicion that my work had been sabotaged. It grieves me to think that someone would go so far as to put someone else's life in danger to get back at me.

As I have told both you and Mr. Albright in the past, I take great pride in my work, and try to be professional in everything I do. Safety is my top priority, and I place a lot of emphasis on it---especially where brakes, tires, fuel, and steering system are concerned.


_Larry Fitzpatrick_
(Signed)

_11/10/05_
(Date)

STATEMENT BY ROBERT SHUFORD, MASTER MECHANIC, AUTO
LIGHT EQUIPMENT DIVISION, CONCERNING INSPECTION AND
REPAIRS ON VEHICLE 6210-2950

On the morning of October 21, 2005, I, Robert L. Shuford, was informed by Mr. Williams Pierce that car 6210-2950 was on the incoming line with a brake caliper hanging loose. I went and looked the car number up in the computer and discovered that Mr. Larry Fitzpatrick had worked on the car October 17, 2005, so I told him to pull the car on the front end rack so we could see what was the cause.

I went back in the Auto Light office to print out a copy of the work order that was performed on the car by Mr. Fitzpatrick. Mr. Albright came in and asked what was wrong with 6210-2950, and I told him that the brake caliper was hanging loose. Mr. Albright said let's go and take a look to see what happen. He left me in the office while I was printing out the last job order and went over to the car. I came out of the office and proceed over to the car and Mr. Albright and Mr. Knox were at the car. Mr. Fitzpatrick come over to the car and Mr. Albright told Mr. Fitzpatrick to leave the car and don't touch it anymore.

We looked at the caliper that was loose and saw that both of the caliper bolts were missing. Mr. Albright told me not to let anyone touch the car, because he was going to have an investigation, however, he called Mr. Kenneth Smith over and told him to check all the brakes. I realize this is an unfortunate incident and blessed that there were not an accident. However, Mr. Fitzpatrick is one of the most productive mechanics in the Auto Light Shop and his productive should be taken under consideration when you consider disciplinary action.

Robert L. Shuford

1

# EXHIBIT

# 12

```
Programs FM115!                    Job Order Summary                    Page
CITY SHOPS DEPARTMENT
                          Job order number:  353155
                          Job number:        1

     Opened by:   ROYCE W ALBRIGHT
     Date/time:   11/02/04   6:09                          Job order status
     Equipment:   2986                                    CLOSED JOB ORDER
     Reference:   6210-2986                Date/time/Opened:  11/02/04  6:0
     Description: 4 DR UTILITY BLAZER     Removed from Service: 11/02/04  6:0
     Department:  062-010 POLICE DEPARTMENT       Repair Scheduled:  0/00/00
                                          Est. Return to Service:  0/00/00
 Meter reading:   60857  MILE             Act. Return to Service:  0/00/00
     Location:    AUTO/LIGHT TRUCK   Out of Service Time (hrs.):      176.0
     Work class:   3   NON-SCHEDULED
 Rsn for work:    04   DRIVER COMPLAINT
     Priority:    1
 Sys. reported:   3200  CRANKING SYSTEM & BATTERY
 Sys. actual:    3737  PUMP
 Action taken:   20  REMOVED & REPLACED
                  REPAIR TO START
```

```
Labor:  **Indirect
                        Act  --Time---  ----Regular----  ---Overtime---     Total
   Date  Employee       tak on   off    Hours  Rate     Hours  Rate         cost

 11/08/04 LARRY B FITZPATRI20 6:30 10:45  4.25  35.00    .00  52.50        148.75
 11/09/04 LARRY B FITZPATRI2011:50 13:30  1.67  35.00    .00  52.50         58.45
                        Total labor:     5.92           .00                207.20
```

```
Parts:                                     Extended                        Total
   Date  Loc  Part number      Quantity       cost        Markup            cost

 11/15/04 N   AAA 12            1.00       330.2300        .00             330.23
              25176789 FUEL PUMP ASSM, INV124839
 11/15/04 N   AAA 12            1.00        13.4200        .00              13.42
              9579 FUEL FILTER-INV857528
                                                      Total parts:         343.65

                                                      Total charge        550.85
```

*No Gasket installed in Tank — Reworked By J.R. Smith on 12/20/04*

(A)

```
Program: FM115L                     Job Order Summary                      Page    1
CITY SHOPS DEPARTMENT
                          Job order number:  354858
                            Job number:       1


    Opened by:  RAYMOND L THOMAS                          Job order status:
    Date/time:  12/07/04   5:29                          CLOSED JOB ORDER*
    Equipment:  2986                            Date/time/Opened: 12/07/04  5:29
    Reference:  6210-2986                    Removed from Service:  0/00/00
  Description:  4 DR UTILITY BLAZER             Repair Scheduled: 12/07/04  8:00
   Department:  062-010 POLICE DEPARTMENT    Est. Return to Service:  0/00/00
                                              Act. Return to Service: 12/08/04 12:40
Meter reading:    62142  MILE                 Act. Return to Service: 12/08/04 12:40
     Location:  AUTO/LIGHT TRUCK      Out of Service Time (hrs.):            31.18
   Work class:    2  SCHEDULED
  Rsn for work:   10  SCHEDULED MAINTENANCE
     Priority:  1
Sys. reported:  9101  PM TYPE-A INSPECTION
  Sys. actual:  9101  PM TYPE-A INSPECTION
 Action taken:    27  SERVICED
                PMA  PM TYPE-A INSPECTION     SEE ATTACHED TASK LIST
```

| Labor: *=Indirect | Act --Time--- | ----Regular---- | ---Overtime--- | Total |
|---|---|---|---|---|
| Date   Employee | tak on   off | Hours   Rate | Hours   Rate | cost |
| 12/08/04 THOMAS M MCLEOD  04 9:00 10:30 | 1.50  35.00 | .00  52.50 | 52.50 | |
| 12/07/04 RODNEY L HARDY    2713:30 14:00 | .50  35.00 | .00  52.50 | 17.50 | |
| Total labor: | 2.00 | .00 | 70.00 | |

| Parts: | | | Extended | | Total |
|---|---|---|---|---|---|
| Date  Loc  Part number | Quantity | cost | Markup | cost | |
| 12/07/04 AP  1  22  110 | 1.00 | 2.3700 | .00 | 2.37 | |
| 1040 OIL GM CARS/TRUCKS | | | Total parts: | 2.37 | |

```
                                              Total charge       72.37
```

```
Program: FM115L                    Job Order Summary                      Page      1
CITY SHOPS DEPARTMENT
                       Job order number:  354952
                          Job number:       1
```

```
   Opened by:  RAYMOND L THOMAS                          Job order status:
   Date/time:  12/08/04  12:10                          CLOSED JOB ORDER*
   Equipment:   2986                        Date/time/Opened: 12/08/04 12:10
   Reference:  6210-2986                 Removed from Service: 12/08/04 12:10
  Description:  4 DR UTILITY BLAZER          Repair Scheduled:  0/00/00
   Department:  062-010 POLICE DEPARTMENT  Est. Return to Service:  0/00/00
                                           Act. Return to Service: 12/08/04 14:55
Meter reading:    62142  MILE              Out of Service Time (hrs.):      2.75
    Location:  AUTO/LIGHT TRUCK
  Work class:    3  NON-SCHEDULED
Rsn for work:   04  DRIVER COMPLAINT
    Priority:  1
Sys. reported:  3400  LIGHTING SYSTEM
 Sys. actual:  3400  LIGHTING SYSTEM
Action taken:   40  REPAIR
               REPLACE HEAD LIGHT CLIP
```

```
Labor:   *=Indirect
                        Act  --Time---  ----Regular----  ---Overtime----      Total
  Date   Employee       tak on    off   Hours   Rate    Hours    Rate         cost

12/08/04 KENNETH R MOSELEY4013:00 13:30    .50  35.00     .00   52.50         17.50
                         Total labor:      .50            .00                 17.50
```

```
Parts:                                       Extended                         Total
  Date  Loc  Part number      Quantity           cost        Markup           cost

12/13/04  N   AAA 12            1.00          3.0100           .00             3.01
              15734237 HEADLIGHT RETAINER INV128177
                                                            Total parts:      3.01


                                                          Total charge       20.51
```

```
Program: FM115L                    Job Order Summary                         Page    1
CITY SHOPS DEPARTMENT
                        Job order number:   355281
                              Job number:     1

    Opened by:  ROYCE W ALBRIGHT                    Job order status:
    Date/time:  12/15/04   6:30                      CLOSED JOB ORDER*
    Equipment:  2986                     Date/time/Opened: 12/15/04  6:30
    Reference:  6210-2986            Removed from Service: 12/15/04  6:30
  Description:  4 DR UTILITY BLAZER        Repair Scheduled:  0/00/00
   Department:  062-010 POLICE DEPARTMENT     Est. Return to Service:  0/00/00
                                          Act. Return to Service:  0/00/00
Meter reading:    62573  MILE
     Location:  AUTO/LIGHT TRUCK    Out of Service Time (hrs.):        128.10
  Work class:    3  NON-SCHEDULED
 Rsn for work:   04  DRIVER COMPLAINT
    Priority:   1
Sys. reported:  3700  FUEL SYSTEM
  Sys. actual:  3700  FUEL SYSTEM
 Action taken:    40  REPAIR      -
              FUEL LEAK AT WHEEL WELL AND CHECK ENGINE LIGHT IS
              ON
```

| Date | Employee | Act tak on | off | Regular Hours | Rate | Overtime Hours | Rate | Total cost |
|------|----------|-----------|-----|-------|------|-------|------|------------|
| 12/20/04 | JOHNNY R SMITH | 40 6:35 | 9:00 | 2.42 | 35.00 | .00 | 52.50 | 84.70 |
| 12/20/04 | JOHNNY R SMITH | 40 12:00 | 14:00 | 2.00 | 35.00 | .00 | 52.50 | 70.00 |
| | Total labor: | | | 4.42 | | .00 | | 154.70 |

Labor: *=Indirect

| Date | Loc | Part number | Quantity | Extended cost | Markup | Total cost |
|------|-----|-------------|----------|---------------|--------|------------|
| 12/28/04 | N | AAA 12 | 1.00 | 4.1500 | .00 | 4.15 |
| | | 1573449 FUEL PUMP SEAL INV129557 | | | Total parts: | 4.15 |

```
                                         Total charge    158.85
```

Program: FM115L                        Job Order Summary                         Page    1
CITY SHOPS DEPARTMENT
                              Job order number:   355849
                                 Job number:        1

    Opened by:  RAYMOND L THOMAS                              Job order status:
   Date/time:  12/28/04   6:23                              CLOSED JOB ORDER*
   Equipment:  2986                         Date/time/Opened: 12/28/04  6:23
   Reference:  6210-2986              Removed from Service: 12/28/04  6:23
 Description:  4 DR UTILITY BLAZER          Repair Scheduled:  0/00/00
  Department:  062-010 POLICE DEPARTMENT  Est. Return to Service:  0/00/00
                                           Act. Return to Service:  0/00/00
Meter reading:   62979  MILE          Out of Service Time (hrs.):         153.28
    Location:  AUTO/LIGHT TRUCK
  Work class:     3  NON-SCHEDULED
Rsn for work:    04  DRIVER COMPLAINT
    Priority:  1
Sys. reported:  3200  CRANKING SYSTEM & BATTERY
  Sys. actual:  3200  CRANKING SYSTEM & BATTERY
Action taken:    40  REPAIR
               CK. ENGINE LIGHT ON AND VEHICLE WILL NOT RUN

| Labor:   *=Indirect | | Act | --Time--- | | -----Regular----- | | ---Overtime----- | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Date | Employee | tak on | off | Hours | Rate | Hours | Rate | | cost |
| 12/28/04 | THOMAS M MCLEOD  40 | 9:00 | 15:00 | 6.00 | 35.00 | .00 | 52.50 | | 210.00 |
| 1/08/04 | THOMAS M MCLEOD  40 | 7:00 | 15:15 | 8.25 | 35.00 | .00 | 52.50 | | 288.75 |
| | | Total labor: | | 14.25 | | .00 | | | 498.75 |

| Parts: | | | | Extended | | | Total |
|---|---|---|---|---|---|---|---|
| Date | Loc | Part number | Quantity | cost | Markup | | cost |
| 12/29/04 | AP | 1   2   3                        | 1.00 | 2.9000 | .00 | | 2.90 |
| | | 0117 CARBURETOR CLEANER | | | | | |
| 12/29/04 | AP | 1   2   33                       | 1.00 | 1.9600 | .00 | | 1.96 |
| | | 0116 INJECTOR CLEANER | | | | | |
| 12/29/04 | AP | 1   22  00693                    | 1.00 | 6.0400 | .00 | | 6.04 |
| | | 3579 FUEL CHEVROLET BLAZER | | | | | |
| 1/04/05 | N | AAA 12                             | 6.00 | 29.5200 | .00 | | 29.52 |
| | | 41-932 SPARK PLUGS INV148328 | | | | | |
| 1/04/05 | N | AAA 12                             | 1.00 | 24.1200 | .00 | | 24.12 |
| | | D328A CAP INV148328 | | | | | |
| 1/04/05 | N | AAA 12                             | 1.00 | 7.7700 | .00 | | 7.77 |
| | | D465 ROTOR INV148328 | | | | | |
| 1/04/05 | N | AAA 12                             | 1.00 | 12.4100 | .00 | | 12.41 |
| | | 213-928 TEMP. SENSOR INV148334 | | | | | |
| 1/04/05 | N | AAA 12                             | 1.00 | 248.6500 | .00 | | 248.65 |
| | | FW155 (15731627) L/F HUB INV373053 | | | | | |
| 1/05/05 | N | AAA 12                             | 1.00 | 76.9500 | .00 | | 76.95 |
| | | 12559850 OXYGEN SENSOR INV197932P | | | | | |
| 1/10/05 | N | AAA 12                             | 1.00 | 6.3900 | .00 | | 6.39 |
| | | 131-113 THERMOSTAT W/GASKET INV148365 | | | | | |
| 1/10/05 | N | AAA 12                             | 1.00 | 29.0900 | .00 | | 29.09 |
| | | 213-912 TPS SENSOR INV148371 | | | | | |
| 1/10/05 | N | AAA 12                             | 2.00 | 115.4200 | .00 | | 115.42 |

Program: FM115L

CITY SHOPS DEPARTMENT
Pag    2

Job Order Summary
Control:  355849
Job order:    00001

| Parts: Date | Loc | Part number | Quantity | Extended cost | Markup | Total cost |
|---|---|---|---|---|---|---|
| 1/10/05 | N | AAA 12 89017453 FUEL PRESSURE REGULATOR INV130776 | 1.00 | 59.1800 | .00 | 59.18 |

Total parts:     659.57

Total charge     1158.32

```
Program: FM110L                    Job Order Summary                        Page    1
CITY SHOPS DEPARTMENT
                         Job order number:   356605
                              Job number:         1


   Opened by:   ROYCE W ALBRIGHT                          Job order status:
   Date/time:   1/12/05   6:15                           CLOSED JOB ORDER*
   Equipment:   2986                        Date/time/Opened: 1/12/05   6:15
   Reference:   6210-2986                   Removed from Service:  1/12/05   6:15
 Description:   4 DR UTILITY BLAZER         Repair Scheduled:   0/00/00
  Department:   062-010 POLICE DEPARTMENT   Est. Return to Service:  0/00/00
                                            Act. Return to Service:  0/00/00
Meter reading:   63444   MILE               Out of Service Time (hrs.):       24.00
    Location:   AUTO/LIGHT TRUCK
  Work class:    3   NON-SCHEDULED
Rsn for work:   04  DRIVER COMPLAINT
    Priority:   1
Sys. reported:  3700   FUEL SYSTEM
  Sys. actual:  3700   FUEL SYSTEM
Action taken:   40   REPAIR
                FUEL LEAK AT LEFT REAR WHEEL


Labor:  *=Indirect
                       Act  --Time---  ----Regular----  ---Overtime----    Total
  Date    Employee     tak on    off   Hours   Rate    Hours   Rate        cost

1/12/05 LARRY G FITZPATRI40 6:30  8:30   2.00   35.00    .00   52.50       70.00
                      Total labor:       2.00            .00               70.00


                                                 Total charge             70.00
```

# EXHIBIT

# 13

## AFFIDAVIT OF GREGORY JOHNSON

STATE OF ALABAMA     )
COUNTY OF MONTGOMERY)

     Personally appeared before me, the undersigned Notary Public in and for the State of Alabama at Large, Gregory Johnson, who is known to me and who, being duly sworn, deposes and says on oath as follows:

     I am a resident of Montgomery County, Alabama, and I am over the age of nineteen (19) years.

    1.    I am a technician in the tire shop of the Fleet Management Department for the City of Montgomery where Mr. Larry Fitzpatrick was a mechanic.

    2.    I have witnessed race discrimination against Mr. Larry Fitzpatrick and other black employees on many occasions in the Montgomery City Garage. I have even been subjected to race discrimination myself.

    3.    I am aware of the situation in which Mr. Fitzpatrick was accused of failing to secure the lug nuts on a city van. I am aware that several lug nuts were found at the rear of the city van after it was parked on the ready line. It would have been impossible for Mr. Fitzpatrick to have driven the vehicle around the garage, then parked it on the ready line and then have the lug nuts fall off and be located near the rear of the van on the ready line. I believe someone tampered with those lug nuts and Mr. Fitzpatrick is being unfairly blamed for that incident.

    4.    I know of a white employee named Billy who was in his probationary period, who caused damage to a police vehicle when he failed to properly secure the lug nuts. That vehicle had to be towed back to the City Garage with damage to the rim and studs. Yet I am not aware of that employee receiving any discipline for that incident.

    5.    I am also aware of the situation in which Mr. Fitzpatrick was accused of failing to

install a hat seal when he installed a fuel pump in a police vehicle. It would not have taken five weeks to discover that the hat seal was missing. As soon as an operator would have put gas in that vehicle, gas would have leaked onto the ground. Also, there would have likely been a warning indication and possibly the fuel pump may have malfunctioned because the tank would not have been sealed.

6.    As to the incident involving the brake calipers, I do not believe the incident could have occurred as was alleged against Mr. Fitzpatrick. When Mr. Fitzpatrick would have test driven the vehicle, he and the supervisor would have heard a noise if the caliper bolts were not installed. Additionally, because of the way the caliper is installed in the wheel well, it cannot fall out unless the wheel is removed.

7.    I am also aware that other black employees, including me, have been discriminated against. I once asked a question in a meeting and I was suspended for ten days. This question was merely why I was assigned a particular number of vehicles. Yet a white employee cursed Mr. Albright during a meeting and he was not even disciplined. I believe Mr. Gaddis and Mr. Albright actually wanted to fire me, but they could not because there were several witnesses to the incident in the meeting.

8.    Since that incident, I have suffered further discrimination and retaliation. I have applied for four positions. I was tied for first place in two of these positions, yet I was not selected. On the first occasion, Mr. Thomas, a white man with less experience that me, was selected even though I was tied for first place for that position. On the second position, Carl Ross, who was less experienced than me, was selected over me. On the third position, a man whom I believe to be Mr. Rogers, who is white, was selected. Finally, a fourth position came open and I tied for first place. I was not even allowed to interview for the position. I was told that I had already interviewed before

2

and that was all they needed.  That position is still open.

9.    I firmly believe that race discrimination exists at the City of Montgomery Garage.

Gregory Johnson

STATE OF ALABAMA                )

COUNTY OF MONTGOMERY)

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that **Gregory Johnson**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on this date.

SWORN TO AND SUBSCRIBED BEFORE ME this 3$\underline{1}$ day of March, 2008.

NOTARY PUBLIC

My Commission expires:  8/12/2010

Prepared by:

**McPhillips Shinbaum  L.L.P.**
P. O. Box 64
Montgomery, AL  36101
**Telephone** - 334-262-1911
Facsimile - 334-263-2321

3

# EXHIBIT

# 14

## AFFIDAVIT OF RODNEY HARDY

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY)

Personally appeared before me, the undersigned Notary Public in and for the State of Alabama at Large, Rodney Hardy, who is known to me and who, being duly sworn, deposes and says on oath as follows:

I am a resident of Lowndes County, Alabama, and I am over the age of nineteen (19) years.

1.     I am a mechanic for the Fleet Management Department for the City of Montgomery where Mr. Larry Fitzpatrick was a mechanic.

2.     I have witnessed race discrimination against Mr. Larry Fitzpatrick and other black employees on many occasions in the Montgomery City Garage. I have also been subjected to race discrimination.

3.     I am aware of the situation in which Mr. Fitzpatrick was accused of failing to install a hat seal when he installed a fuel pump in a police vehicle. It would not have taken five weeks to discover that the hat seal was missing. Also, there would have been a check engine warning indication because the fuel tank would not have been sealed.

4.     As to the incident involving the brake calipers, I do not believe the incident could have occurred as was alleged against Mr. Fitzpatrick. The brake caliper cannot fall out unless the wheel is removed. Mr. Albright is aware of this fact because when he was trying to make a videotape of how to remove the brake calipers, he could not get the caliper off without removing the wheel from the hub.

5.     I am aware that other black employees, including me, have been discriminated against. I was once suspended for three days when it was alleged that I had left something in the

against. I was once suspended for three days when it was alleged that I had left something in the wheel of a vehicle. However, after Johnny Ray Smith supposedly repaired the wheel, the vehicle was returned within three days and the wheel was so hot, it had to be cooled with water. He attempted to repair it again, but it returned yet again five days later. Johnny Ray Smith was not disciplined in any manner for this incident, but I was suspended.

6.      I am also aware of other problems Johnny Ray Smith has had with repairing city vehicles. On one occasion, he was supposed to have done the work on a Ford Taurus and the vehicle was returned. When the vehicle was put on the rack and the wheel drum was removed, all of the brake parts fell out onto the floor. Johnny Ray Smith received no discipline for this incident, to my knowledge. There was another incident where Mr. Smith worked on the axle of a Crown Victoria. The vehicle was returned shortly thereafter and the work had to be redone.

7.      Mr. Larry Fitzpatrick had, on several occasions, reported that someone had tampered with his work. However, our supervisors would take no action to insure that the tampering stopped or that the person doing the tampering was caught. Mr. Fitzpatrick asked me to look over his work, because there were concerns by supervisors that he was not properly doing his work. In the times I checked his work, I never found anything wrong. On one occasion, Mr. Fitzpatrick called me over, before lunch, to take a look at the brake lines on a vehicle he had worked on that morning. There was no brake fluid on the connections at that time and the connections were secure. However, after we returned from lunch, Mr. Fitzpatrick called me over and showed me that brake fluid was leaking from the same connections we had inspected before lunch. Therefore, I am certain someone tampered with Mr. Fitzpatrick's work that day.

8.      I believe race discrimination continues to exist at the City of Montgomery Garage and

2

_Rodney Hardy_
_____
Rodney Hardy


STATE OF ALABAMA          )

COUNTY OF MONTGOMERY)

    I, the undersigned, a Notary Public in and for said County in said State, hereby certify that **Rodney Hardy**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on this date.

    SWORN TO AND SUBSCRIBED BEFORE ME this ____ day of April, 2008.

_Patricia P. Williams_
_____
NOTARY PUBLIC

My Commission expires: ___8/12/2010___


Prepared by:

**McPhillips Shinbaum L.L.P.**
P. O. Box 64
Montgomery, AL 36101
Telephone - 334-262-1911
Facsimile - 334-263-2321


3

Julian L. McPhillips, Jr. *
Kenneth Shinbaum
Aaron J. Luck
James G. Bodin
Joseph C. Guillot
Elizabeth Bern Spear

Of Counsel
G. William Gill

# McPhillips Shinbaum, L.L.P.
### ATTORNEYS AND COUNSELORS AT LAW
516 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36104

Mailing Address
Post Office Box 64
Montgomery, Alabama 36101

TELEPHONE (334) 262-1911
TOLL FREE (866) 224-8664
FAX (334) 263-2321

## CONFIDENTIAL CLIENT INFORMATION

_____

Name of Attorney and Appointment Time

**MODEST CONSULTATION FEE:**  Employment-related cases; discrimination cases; civil rights cases; police brutality cases; criminal defense; real estate problems; domestic — $60.00 up to the first 30 minutes; $100.00 if close to one hour unless otherwise agreed.

**FREE INTERVIEW:**  Auto accidents; personal injuries; wrongful death; victims of drunk drivers; defective product cases; fraud cases; insurance claims; workers compensation cases.

### PLEASE FILL OUT ENTIRE FORM

NAME: _Rodney Hardy_        DATE OF BIRTH: _6/21/66_

ADDRESS: _192 Sandy St_  CITY: _Lowndesboro_ STATE: _AL_ ZIP: _36752_

SOC. SEC. NO. _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_    EMPLOYER: _City of Montgomery_

HOME PHONE: _____  WORK PHONE: _241-2511_ CELL PHONE: _6670515_

SPOUSE'S NAME: _____

YOUR EMAIL ADDRESS: _Har589@NetZero.com_

NAME OF OPPOSING PARTY (*WHO IS THIS AGAINST*): _____

BRIEF DESCRIPTION OF LEGAL PROBLEM (*WHAT HAPPEN*): _____

_____

_____

HOW DID YOU SELECT THIS FIRM?    GENERAL REPUTATION    REFERRAL BY AN INDIVIDUAL

YELLOW PAGES AD-    YELLOW PAGES    OR    YELLOW BOOK    (CIRCLE ONE)

TELEVISION COMMERCIAL (       )    (PLEASE WRITE IN THE STATION)

I understand that no attorney in this firm will take any action on my behalf for any matter until a contract of representation is signed.

_Rodney Hardy_                    _5-10-08_
SIGNATURE                         DATE

# EXHIBIT

# 15

# AFFIDAVIT OF ROBERT L. SHUFORD

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY)

Personally appeared before me, the undersigned Notary Public in and for the State of Alabama at Large, Robert L. Shuford, who is known to me and who, being duly sworn, deposes and says on oath as follows:

I am a resident of Elmore County, Alabama, and I am over the age of nineteen (19) years.

1.      I am a supervisor in the Fleet Management Department for the City of Montgomery where Mr. Larry Fitzpatrick was a mechanic.

2.      I have witnessed race discrimination against Mr. Larry Fitzpatrick on many occasions in the Montgomery City Garage.

3.      Examples of race discrimination include numerous occasions where white employees are allowed to either come in late or clock in and malinger prior to actually beginning work. The white employees are not disciplined or counseled in any way. If a black employee comes in late or is believed to be wasting time, that black employee is immediately counseled or disciplined.

4.      On one occasion, Mr. Larry Fitzpatrick was still eating a sandwich about five (5) minutes after he clocked in and he was counseled. He was scolded for eating a sandwich while "on the clock," however, almost every morning, Mr. Donald Knight, a white employee, eats a honey bun shortly after he clocks in, and he is not counseled or reprimanded in any way.

5.      Once when Mr. Fitzpatrick was test driving a vehicle with me, Mr. Albright attempted to call me, but I did not answer my cell phone because I did not hear it ring. Mr. Albright later complained to me that he had not been able to locate Mr. Fitzpatrick. Even though I told Mr. Albright that Mr. Fitzpatrick was with me and working at the time, he counseled Mr. Fitzpatrick and gave him a five (5) day suspension.

6.    On yet another occasion, a white employee, namely, Mr. Johnny Smith, made some obscene remarks to Mr. Roy Wilson, a white supervisor. Mr. Wilson and I wrote Mr. Smith up and turned in my writeup to Mr. Albright but nothing was done to Mr. Smith following my writeup.

7.    I am aware of the situation in which Mr. Fitzpatrick was accused of failing to secure the lug nuts on a city van. The lug nuts had to be on the van when Mr. Fitzpatrick backed the van off of the front-end alignment rack. Otherwise the tire would have come off when he turned the wheel as he left the rack. I am also aware that Mr. Fitzpatrick drove the vehicle around the garage before placing it on the ready line. I am also aware that several lug nuts were found at the rear of the city van after it was parked on the ready line. It would have been impossible for Mr. Fitzpatrick to have driven the vehicle around the garage, then parked it on the ready line and then have the lug nuts fall off and be located near the rear of the van on the ready line. Someone must have tampered with those lug nuts and Mr. Fitzpatrick is being unfairly blamed for that incident.

8.    Mr. Larry Fitzpatrick was terminated for allegedly leaving the bolts out of a brake caliper on a police vehicle. During the hearing of Mr. Fitzatrick's case, there was testimony presented that would indicate it was virtually impossible for that brake caliper to fall out in the manner that was alleged. Additionally, the fact that the vehicle was found to have a brake caliper hanging, three days after the vehicle was removed from the City Garage, makes it even less likely that this incident was caused by Mr. Fitzapatrick.

9.    There have been incidents where white employees had similar or worse mechanical errors and were not disciplined. Mr. Kenny Smith, a white mechanic, left the plug out of the rear end of a vehicle, causing oil to leak out and ruin the rear end. He only received a letter of counseling. He was not terminated.

10.    In another incident, Mr. Fitzpatrick changed a fuel pump on a police vehicle. About

2

*five weeks* later, the vehicle was returned for complaints of gas fumes, so white mechanic, Mr. Johnny Smith, did the repair and reported to me that the hat seal was missing. During the five week period before the vehicle was repaired by Mr. Smith, the vehicle was also brought in for preventive maintenance (PM), which was performed by Mr. Thomas McLeod. If the hat seal had been left out, the fuel smell would have been detected by Mr. McLeod at that time. Coincidently, when Mr. Smith replaced the fuel pump, the vehicle was returned to the garage because it would not run properly. After the needless expenditure of about $1,300 in parts trying to solve the problem, it was discovered that Mr. Smith had crimped the fuel line while making his repairs. Mr. Smith was not disciplined in any way for that incident.

11.    I have heard Mr. William Pierce, a white mechanic, and Mr. Johnny Smith, another white mechanic, curse Mr. Albright on many occasions when they have been told to do some work. They have never been reprimanded or written up. However, a Black employee has received extreme discipline in the form of a suspension for simply asking a question in a meeting.

12.    The City Garage has a long history of incidents in which blacks are treated less favorably than whites in that blacks are disciplined severely, while whites, in most incidents, are not disciplined at all.

13.    I have also received retaliation for speaking up on behalf of Mr. Larry Fitzpatrick. Following Mr. Fitzpatrick's hearing with the City of Montgomery, in which I testified favorably to Mr. Fitzpatrick, I was disciplined.

14.    I firmly believe that race discrimination exists at the City of Montgomery Garage.

Robert L. Shuford

3

STATE OF ALABAMA )

COUNTY OF MONTGOMERY)

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that **Robert L. Shuford**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he executed the same voluntarily on this date.

SWORN TO AND SUBSCRIBED BEFORE ME this _____ day of April, 2008.

NOTARY PUBLIC

My Commission expires: _8/12/2010_

Prepared by:

**McPhillips Shinbaum  L.L.P.**
P. O. Box 64
Montgomery, AL  36101
**Telephone** - 334-262-1911
Facsimile - 334-263-2321

4

# EXHIBIT

# 16

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22ⁿᵈ Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Charge Number: 420 2006 01298

Larry Fitzpatrick
5137 Newbury Lane
Montgomery, AL 36108                 Charging Party

City of Montgomery
Post Office Box 1111
Montgomery, AL 36104                 Respondent

<u>LETTER OF DETERMINATION</u>

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. (Title VII).   Timeliness and all other requirements for coverage have been met.

Charging Party alleges that Respondent has engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, as amended, by terminating him in retaliation for filing previous race discrimination charges.

Respondent denies the allegations.

Evidence indicates that the Charging Party was subjected to race discrimination and retaliatory discipline by being discharge.  Evidence further indicates that White employees who committed mechanical errors were not disciplined or discharged as the Charging Party.

I have determined that the evidence obtained during the investigation establishes that there is reasonable cause to believe that a violation of the statute has occurred.

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter.   Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address not later than _____ 5 FEB 2007 _____.   You may fax your response directly to (205) 212-2070 to the attention of Devoralyn McGhee, Investigator.  Failure to respond by _____ 5 FEB 2007 _____ will indicate that you are not interested in conciliating this

matter and the Commission will determine that efforts to conciliate this charge as required by Title VII of the Civil Rights Act of 1964, as amended, have been unsuccessful.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission.

On behalf of the Commission:

**1 9 JAN 2007**
Date

Delner Franklin-Thomas
District Director

Enclosure:  Invitation to Conciliate

cc:  Joseph C. Guillot, Attorney
     McPhillips Shinbaum, L.L.P.
     Post Office Box 64
     Montgomery, AL  36101

     Michael D. Boyle, Associate City Attorney
     Post Office Box 1111
     Montgomery, AL  36101-1111